**TIME WARNER ENTERTAINMENT COMPANY, L.P., Appellant–Defendant,**

v.

**Kelly J. WHITEMAN and Jean Wilson, Appellees–Plaintiffs.**

No. 49A02–9910–CV–719.

Court of Appeals of Indiana.

Jan. 16, 2001.

Scott D. Himsel, Baker & Daniels, Indianapolis, Indiana, Attorney for Appellant.

Irwin B. Levin, Richard E. Shevitz, Scott D. Gilchrist, Cohen & Malad, P.C., Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Time Warner Entertainment Company, L.P., ("Time Warner"), appeals the trial court's grant of a motion to correct error filed by Kelly Whiteman and Jean Wilson (collectively "the Plaintiffs") in their consolidated action against Time Warner.

We affirm in part and reverse in part.

### ISSUE

Whether the trial court erred in granting the Plaintiffs' motion to correct error.

### FACTS

The facts are undisputed. Time Warner provides cable services to subscribers in Indianapolis. Subscribers are billed monthly, in advance. Time Warner charges a $4.65 late fee if its subscribers do not timely pay their monthly cable bills.

The Plaintiffs are Time Warner subscribers. When they subscribed to Time Warner's programming service, the Plain-

tiffs signed contracts that expressly permit Time Warner to charge a late fee if the Plaintiffs fail to pay their cable bills by the due date listed on their bills. The Time Warner contracts refer to the late fee as a "handling charge" and as an "administrative charge." (R. 360, 363). Monthly cable bills also remind customers to pay their bills by a certain date to avoid paying the $4.65 late fee. The Plaintiffs have paid late fees in the past.

The Plaintiffs filed actions against Time Warner in January 1998 and February 1998, respectively, on behalf of themselves and a putative class of others similarly situated. The complaints allege[1] that Time Warner's late fee is unlawful and unenforceable because it is excessive, unreasonable, and a penalty. The two actions were consolidated in April 1998. The claims raised in the Plaintiffs' complaints fall into two categories: 1) claims for money damages which seek to recover the allegedly excessive late fees that Time Warner has collected in the past, and 2) claims for declaratory and injunctive relief which seek to prohibit Time Warner from charging an allegedly excessive late fee in the future.

In July 1998, Time Warner filed a motion to dismiss the Plaintiffs' claims for money damages pursuant to Ind. Trial Rule 12(B)(6) on the grounds that (a) none of the Plaintiffs' claims for money damages state a cognizable claim under Indiana law, and (b) such claims, even if actionable, are barred by the voluntary payment doctrine. Time Warner's motion also requested summary judgment as to the Plaintiffs' claims seeking to both declare the late fee invalid and enjoin Time Warner from collecting the fee in the future. In its summary judgment motion, Time Warner contended that its late fee is a valid liquidated damages assessment. In support of its contention, Time Warner designated, among other things, a 1997 Time Warner cost study and the affidavit of Rick Langhals, Vice Presi-

dent of Finance for Time Warner in Indianapolis.

According to Langhals, Time Warner charges a late fee to recover some of the costs that the company incurs when customers fail to timely pay their cable bills. Langhals explained that Time Warner conducted a study of the costs that it incurred from January through November 1997 due to the failure of its customers to timely pay their bills. On average, 24% of Time Warner's 84,000 Indianapolis cable subscribers failed to timely pay their cable bills each month. That leads to a total of 202,558 customers who failed to timely pay their cable bills within the ten-month study period. Time Warner's cost study identified the cost of the extra work that Time Warner employees had to do because the subscribers failed to pay their bills on time.

For example, Time Warner has a collection manager and 11 collection employees who spend 96% of their time communicating with the late payers. In addition, general customer service representatives spend 18% of their days dealing with late payers, and lobby personnel spend 39% of their days serving late payers. In addition, Time Warner employs field collectors who visit subscribers at their homes.

Time Warner used these percentages to determine what portion of its building, utilities and salaries to include as costs attributable to late payments. Time Warner also included in its study data processing, postage and other expenses incurred as a result of late payments. In addition, Time Warner included in the study its costs resulting from the loss of use of money because customers paid late. As a result of the ten-month study, Time Warner determined that the 202,558 delinquent customers caused the company to incur costs of $1,035,139—a $5.11 monthly net cost per delinquency. Therefore, according to Time Warner, its $4.65 monthly late fee

---

1. Wilson's request to dismiss voluntarily a Uniform Commercial Code claim contained within her complaint was granted by the trial court within its July 9, 1999 order.

does not even cover the costs that it incurs as a result of late payments.

The Plaintiffs filed a response to Time Warner's summary judgment motion and designated, among other things, an affidavit of Andrea Crane and a declaration of John Lehman. Crane is a regulatory rate-setting consultant who has testified in more than 80 administrative proceedings on issues relating to cable television and other utilities. Most of the proceedings involved issues regarding the appropriate costs to recover from ratepayers through regulated rates. At the time she prepared her affidavit, Crane had been the sole consultant to the state of New Jersey, Division of Rate Payer Advocate, on all cable television matters for the previous five years. In this capacity, Crane has reviewed and analyzed approximately 200 cable television rate filings, including Federal Communications Commission forms, which govern the rates charged by cable providers such as Time Warner.

In preparing her affidavit, Crane reviewed Langhals' affidavit, Time Warner's cost study, and FCC forms filed by Time Warner. According to Crane, Time Warner uses the FCC's benchmark method to set its rates for cable services. The benchmark form of regulation is designed to cover all costs and provide a profit. According to Crane, Time Warner's late fee cannot be justified as a fee necessary to recover costs associated with delinquent payers because those costs are already recovered in the benchmark rate. Further, Time Warner's use of late fees to recover costs included in the FCC's basic rate structure results in a double recovery of these costs—once through Time Warner's FCC-approved rates and again through the collection of a separate late payment fee.

Crane further explained that the methodology employed in Time Warner's cost study is flawed because it includes "many costs in excess of those incremental costs directly related to the collection of late payments." (R. 1262). Specifically, Crane explained as follows:

Many of the costs included in the study relate to costs for non-collection. These costs result from customers who do not pay their bills at all, and are not directly attributable to customers who simply pay late.

Time Warner Indianapolis has included costs for various salary and wage categories in its late fee study. However, Company has not demonstrated that these costs are incremental to the late payment function. In some cases, these costs relate to overhead positions such as the Director of Human Resources. In my opinion, Time Warner Indianapolis would not experience lower costs for these positions if all customers made timely payments.

Time Warner has included costs such as general insurance, utilities, property taxes, and depreciation in its late fee costs. In my opinion, none of these costs should be included in a late fee since the level of general insurance, utilities, property taxed, and depreciation does not change as a result of late payments. Time Warner also included 30% of its data system billing costs in its late payment costs. No documentation was provided for this estimate. Moreover, it is likely that at least some of these costs relate to nonpaying customers, rather than late paying customers, and therefore these costs should not be included in late payment fees.

(R. 1262).

Crane concluded her affidavit as follows: (i) Time Warner Indianapolis is already recovering through its FCC-approved cable service rates, which were established using the benchmark methodology, the costs represented to be recovered through its late fee; (ii) Time Warner may also be recovering some of these costs in the equipment and installation rates charged to customers; (iii) the Time Warner cost study contains many costs that are not incremental to

late payments and are therefore inappropriate for inclusion in a cable late fee.

(R. 1262).

John Lehman is a certified public accountant who has provided analysis and testimony on behalf of cable television customers and regulators in cases concerning the reasonableness of late payment fees charged subscribers for late payments by at least fifteen cable television providers. Like Crane, Lehman reviewed Time Warner's cost study and Langhals' affidavit. According to Lehman, based upon his training and experience, Time Warner's $4.65 late fee is "not reasonable" and "bears no relation to the actual costs incurred by Time Warner when a customer fails to pay a bill on time." (R. 709). Lehman averred that the premise for Time Warner's cost study was flawed. Specifically, Lehman explained as follows:

8. Time Warner's cost study does not reflect the costs caused by a subscriber who fails to pay a cable bill on time. Instead, the cost study is a study of the average of aggregate costs, including costs of overhead and infrastructure, which Time Warner claims are associated with those who pay late and those who never pay at all. Costs of overhead and infrastructure are not causally related to a subscriber's failure to pay on time. Rather, these costs, (including building, insurance, utilities and the like) would exist whether or not a subscriber pays a bill late. These overhead or infrastructure costs are costs of doing business and should not be included as costs incurred because a cable television subscriber fails to pay a bill on time....

12. Similarly, the majority of costs Time Warner's cost study claims are associated with customer service and the lobby payment center are inappropriately allocated as costs associated with late-fee payments. Customer service representatives, telephones, cashiers and other infrastructure are also necessary elements of running a cable business whether an individual subscriber pays late or not. Moreover, the time allegedly spent by customer service representatives in dealing with delinquent accounts, as shown in the cost study, is suspect. According to industry experience, most customers who pay late, actually end up paying their bill within two weeks of being assessed the late fee. Time Warner's own cost study shows that over half of its "delinquent" customers, those who are assessed a late fee, pay before Time Warner engages in any activity to collect on the delinquent accounts. As a result, customer service representatives do not typically spend a great deal of time in collection activities.

(R. 709–711). Lehman concluded that the maximum charge caused by a subscriber who pays late is "no more than $.36...." (R. 711).

After a hearing, on July 9, 1999, the trial court issued a 20 page order granting Time Warner's motions. Therein, the trial court dismissed the Plaintiffs' claims for money damages. Specifically, the court 1) entered a T.R. 12(B)(6) dismissal of the Plaintiffs claims for money damages, and 2) entered summary judgment in favor of Time Warner on the Plaintiffs' remaining claims for declaratory and injunctive relief.

The Plaintiffs filed a motion to correct error in August 1999. After a hearing, the trial court issued an order 1) granting the motion to correct errors, 2) vacating the previously granted motions to dismiss and for summary judgment, and 3) denying Time Warner's motions to dismiss and for summary judgment. It is from this order that Time Warner appeals.

### DECISION

As a preliminary matter, the parties disagree on the standard of review. Time Warner argues that the standard of review is de novo. The Plaintiffs argue that because we are reviewing the grant of a motion to correct error, the standard of review is abuse of discretion. Although

the judgment from which the motion to correct error was granted included a T.R. 12(B)(6) dismissal and summary judgment, the judgment from which Time Warner appeals is the order granting the motion to correct error. See *Heredia v. Sandler*, 605 N.E.2d 1212, 1215 (Ind.Ct.App.1993). A decision to grant a motion to correct error is reviewed for an abuse of discretion. *See Malacina v. Malacina*, 616 N.E.2d 1061, 1062–63 (Ind.Ct.App.1993). However, because we must determine whether the trial court abused its discretion by altering its decision as to the T.R. 12(B)(6) dismissal and the summary judgment, those standards are implicated as well. See *Heredia*, 605 N.E.2d at 1215.

We turn to the parties' contentions. As noted in the facts, the claims raised in the Plaintiffs' pleadings fall into two categories: 1) claims for money damages which seek to recover the allegedly excessive late fees that Time Warner has collected in the past, and 2) claims for declaratory and injunctive relief which seek to prohibit Time Warner from charging an allegedly excessive late fee in the future.

## I. *Money Damages*

 Time Warner argues that the trial court erred in granting the Plaintiffs' motion to correct error, thereby vacating its order of dismissal of the Plaintiffs' claims for money damages, because none of the Plaintiffs' claims for money damages state a cognizable claim under Indiana law. "In reviewing a ruling on a motion to dismiss, we stand in the shoes of the trial court and must determine if the trial court erred in its application of the law." *American Dry Cleaning & Laundry v. State*, 725 N.E.2d 96, 98 (Ind.Ct.App.2000). We will view the pleadings in a light most favorable to the plaintiffs and draw every reasonable inference in their favor. *See Ratliff v. Cohn*, 693 N.E.2d 530, 534 (Ind. 1998). A motion to dismiss is proper if it is apparent that the complaint states a set of facts and circumstances, which, even if true, would not support the relief request-

ed. *See Minks v. Pina, City of Hammond et al.*, 709 N.E.2d 379, 381 (Ind.Ct.App. 1999), trans. denied.

Time Warner contends that the voluntary payment doctrine bars relief in favor of the Plaintiffs on their claims for money damages. Because the voluntary payment doctrine is dispositive as to the claims for money damages, we will address the claims in that context.

 The general rule is that "a voluntary payment made under a mistake or in ignorance of law, but with a full knowledge of all the facts, and not induced by any fraud or improper conduct on the part of the payee, cannot be recovered back." *City of Evansville v. Walker*, 162 Ind.App. 121, 318 N.E.2d 388, 389 (1974) (quoting 23 I.LE., Payment § 43, p. 136). In *City of Evansville*, the plaintiffs sought to recover parking fines they paid for violations issued on federal property that was not within the city's authority. The plaintiffs discovered the lack of authority after they had paid the fines. The court determined that recovery was barred because the plaintiffs had sufficient knowledge of the facts to render the payments voluntary. *Id.* The court stated:

> The appellees had the opportunity to plead not guilty and challenge their [parking] citations. Instead they chose to plead guilty and voluntarily pay their fines under the mistaken belief that valid city ordinances covered the lots in question. Under the above rule of law the fines, therefore, are not recoverable.

*Id.* at 390; *see also Hollingsworth v. Stone*, 90 Ind. 244, 246–47 (1883) (money paid even under compulsion of legal process is voluntary when no mistake of fact or fraud induced the payment); *Brune v. Marshall*, 169 Ind.App. 637, 350 N.E.2d 661, 663 (1976) (voluntary payment doctrine barred recovery of fee paid for unauthorized program even though parties mistakenly believed the program was authorized at the time of payment). We conclude that knowledge by the payor and

fraud or imposition by the payee are the two key factors in application of the voluntary payment doctrine.

Time Warner directs us to cases from other jurisdictions which have held that the doctrine bars cable subscribers from recovering a late fee that they have already paid to their cable provider. In *Hassen v. Mediaone of Greater Florida,* 751 So.2d 1289, 1290 (Fla.Dist.Ct.App. 2000), the court recognized that the cable subscribers did not have knowledge of whether the actual costs incurred by the cable company due to late payments were related to the late payment fee imposed by the company. The court stated:

> It does not matter that the payment may have been made upon a mistaken belief as to the enforceability of the demand, or liability under the law, as long as payment is made with knowledge of the factual circumstances.... [P]ayment should ordinarily be deemed voluntary unless the circumstances present some constraint or compulsion of such a degree as to impose a necessity of payment sufficient to overcome the mind and will of a person of ordinary firmness. The appellants' desire for cable television services, and their assertion of a right to make late payment for such services without incurring late charges in the amounts here imposed, are not such circumstances as to destroy the voluntary character of the appellants' payment. Even if the appellants were unaware of the actual costs which the appellee incurred in connection with the late payment, the appellants were informed of the payment deadlines and the possibility that the late charges could be imposed upon late payment.

*Id.; see also Telescripps Cable Co. v. Welsh,* 247 Ga.App. 282, 542 S.E.2d 640 (2000) (citing *Hassen,* and determining the voluntary payment doctrine precluded recovery of money paid in late fees entitling cable company to dismissal of plaintiffs' claims); *McWethy v. Telecomm., Inc.,* 988 P.2d 356, 357–58 (Ok.Civ.App.1999) (affirming dismissal on basis of voluntary payment doctrine where customer had knowledge of the late payment fee by its inclusion in service contract).

Here, the Plaintiffs contend that they paid the fees without knowledge that the late fees did not accurately reflect the costs associated with late payments by the subscribers. The Plaintiffs argue that the voluntary payment doctrine does not apply in this case because "they paid Time Warner's late fees without full knowledge of the facts." Plaintiffs' Brief at 15. Specifically, they contend that they did not have knowledge that Time Warner's late fees were unreasonable and amounted to a penalty. In support of their contention, in a submission of additional authority,[2] they direct us to *TCI Cablevision of Dallas v. Owens,* 8 S.W.3d 837 (Texas Ct.App.2000), wherein TCI appealed the trial court's certification of a class. TCI argued that the voluntary payment doctrine barred the claim. The Texas Court of Appeals noted that "other jurisdictions ... are divided in applying the voluntary payment rule to claims regarding the payment of late fees for cable television service. Considering the split of authority and [the plaintiff's] statement that he did not have full knowledge of the material facts, it is far from clear that the voluntary payment doctrine applies here." *Id.* at 845. The Texas court affirmed certification of the class.

■ The authority from other jurisdictions is instructive with regard to the type of knowledge that bars recovery of "payment[s] made under a mistake or in ignorance of law...." *See City of Evansville,* 318 N.E.2d at 389 (reciting Indiana's voluntary payment doctrine). The weight of the authority from other jurisdictions leads to a conclusion that even where the claim

**2.** We find inapposite the parties' submissions of additional authority that do not address the voluntary payment doctrine or that address the doctrine in the context of a specific statutory limitation on the amounts an entity may charge.

for money damages is based upon an assertion that the late fee payments, as established within the contract, were made without full knowledge of the costs incurred by the entity demanding the late payment fee, the voluntary payment doctrine is applicable. The onus is upon the party making the payment to inquire about the reasonableness of the charge before making the payment, or perhaps before signing the contract that specifies the late charge.

In addition to knowledge of the circumstances, the other principle factor in determining whether recovery is barred by a voluntary payment is the compulsion to pay. In *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 213 Ill.Dec. 304, 658 N.E.2d 1325 (1995), the court determined that the voluntary payment doctrine barred recovery of the payment for a pay-per-view program where the customers paid to prevent interruption of cable service or damage to their credit. The customers paid the charge after lodging a protest by filing suit. The court stated:

> Ordinarily, payment made pursuant to threat of litigation or to prevent the bringing of a legal action is regarded as voluntary for the reason that an ample remedy by way of defense to the suit would exist and because no loss could occur until the lawsuit was instituted and proceeded to judgment. Thus, Plaintiffs' allegations that they made payment to avoid the threat of lawsuit or actual institution of a lawsuit against them for failure to make payment would not support a finding of payment under compulsion.

> A similar result is warranted with respect to Plaintiffs' allegations of threat of or actual loss of cable service based upon their prior experience with Prime Cable. As stated above, in order to render payment compulsory, there must have been some necessity and "such pressure must be brought to bear upon the person paying as to interfere with free enjoyment of his rights of person or property." That pressure is established by allegation of some actual or threatened power wielded over the payor from which he has no immediate relief and from which no adequate opportunity is afforded to effectively resist the demand for payment. Here we question whether cable service is a necessity such that the loss or threatened loss thereof could ever furnish the motive for payment under compulsion or economic duress.

*Id.,* 213 Ill.Dec. 304, 658 N.E.2d at 1332–33 (citations omitted); *cf. Beachlawn Building Corporation v. City of St. Clair Shores,* 370 Mich. 128, 121 N.W.2d 427 (1963) (determining that builder did not pay municipalities' building fees voluntarily because fees were unlawful exactions paid under compulsion or duress of discontinuing builder's business).

■ We agree with the jurisdictions that have held that the potential loss of cable service, or the threat of litigation will not support the type of compulsion necessary to render the late fee payments involuntary. Review of the Plaintiffs' complaints does not reveal the possibility of any other compulsion.

■ Because the pleadings do not reveal any circumstances under which the Plaintiffs could recover money damages and avoid the voluntary payment doctrine, the trial court abused its discretion by granting the Plaintiffs' motion to correct error as to the money damages portion of their claim.

## II. *Declaratory and Injunctive Relief*

Time Warner also argues that the trial court erred in granting the Plaintiffs' motion to correct error that reversed the grant of summary judgment for Time Warner with regard to the Plaintiffs' requests for declaratory and injunctive relief to prohibit excessive late fee charges in the future.

Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. *Warner Trucking, Inc. v. Carolina Casualty Ins. Co.*, 686 N.E.2d 102, 104 (Ind.1997) (citing Ind. Trial Rule 56(C)). In reviewing the trial court's entry on a summary judgment motion, we apply the same standard used in the trial court, *i.e.*, whether there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Shell Oil Co. v. Lovold Co.*, 705 N.E.2d 981, 983–84 (Ind. 1998).

Time Warner directs us to *Gershin v. Demming*, 685 N.E.2d 1125, 1128 (Ind.Ct. App.1997), as authority for the proposition that its late fee is a permissible, valid liquidated damages charge, not an impermissible penalty. "Where the sum stipulated in the agreement is not greatly disproportionate to the loss likely to occur, the provision will be accepted as a liquidated damages clause and not as a penalty...." *Id.* However, where the amount set as liquidated damages is grossly disproportionate to the loss which may result from the breach, the courts will treat the sum as a penalty rather than as liquidated damages. *Id.*

Time Warner argues that, as in *Gershin*, its late payment fee is not greatly disproportionate to its loss. Specifically, Time Warner contends that pursuant to *Gershin*, Time Warner is entitled to recover costs incurred when its subscribers fail to timely pay their monthly cable bills. According to Time Warner, its 1997 cost study showed that the company incurs a $5.11 monthly net cost per delinquency. Therefore, its $4.65 monthly late fee does not even cover the costs that it incurs as a result of late payments.

The Plaintiffs respond that the Crane affidavit and the Lehman declaration show that the expenses covered in Time Warner's cost study are 1) subsumed in Time Warner's benchmark rates, and 2) included expenses that are not causally related to a customer's late payment of a bill. There-

fore, according to the Plaintiffs, the Crane affidavit and Lehman declaration raise

> genuine issues of material fact concerning whether costs included in Time Warner's cost study duplicate costs recovered under the 'benchmark rate' charged to all subscribers. The evidence also raises genuine issues of material fact concerning whether the costs included in Time Warner's cost study may be attributed to late payments at all, or whether they are instead 'fixed costs' that Time Warner would incur regardless of whether a customer pays late. Any one of these issues precludes summary judgment, and the trial court properly denied Time Warner's Motion.

Plaintiffs' Brief at 25.

Time Warner responds by attacking Crane's affidavit and Lehman's sworn declaration. Time Warner first contends that Crane and Lehman did not raise any genuine issues of material fact because they did not base their statements on admissible facts about Time Warner's Indianapolis cable system. Time Warner directs us to *Doe v. Shults–Lewis Child and Family Services, Inc.*, 718 N.E.2d 738 (Ind.1999), for the proposition that the trial court must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. Time Warner further argues that Crane and Lehman have not stated any accounting principles to support their opinions. Time Warner again cites *Doe* for the proposition that an expert opinion must state the reasoning or methodologies upon which it is based.

In *Doe*, the court examined Ind. Evidence Rule 702 regarding admission of expert testimony in light of decisions concerning the requirements for experts who give scientific testimony, and in the context of a summary judgment. *Id.* at 748–51. At issue was an affidavit by a psychiatrist giving his opinion that a plaintiff suffered repressed memory. In order to discern " 'junk science' from reliable scientific evidence," and to assess technical informa-

tion, the court announced the following standard:

> Therefore, we believe that an expert opinion affidavit submitted in a summary judgment proceeding, in addition to asserting admissible facts upon which the opinion is based, must also state the reasoning or methodologies upon which it is based. The reliability of the scientific principles need not be established, but the trial court must be provided with enough information to proceed with a reasonable amount of confidence that the principles used to form the opinion are reliable. The trial court is in the best position to make such determinations, as it is in the trial court that the issue may be fully explored. This approach both allows the trial court to perform its gatekeeping function at the summary judgment stage of the proceedings and avoids placing an onerous burden upon the nonmoving party.

*Id.* at 750–51. The court explained that to raise a genuine issue of material fact an expert's opinion must do more than assert bald conclusions or supply a "bottom line." *Id.* at 751.

The affidavits submitted by the Plaintiffs are not mere "bottom line" assertions of opinions, or bald conclusions as rejected in *Doe*. Crane's affidavit, including her curriculum vitae, exhaustively set out her years of experience with regulated industries, and the cable industry in particular. She asserted her knowledge of FCC filings, forms, and cases. She detailed the materials upon which she relied when she prepared her affidavit. Further, she averred:

> The opinions summarized in this Affidavit are based upon: (i) my education, training and experience, summarized above and in my attached Curriculum Vitae; (ii) my familiarity with the FCC's rules, regulations, and forms for establishing service rates; (iii) my experience as a participant in regulatory proceedings concerning the setting of cable television rates; (iv) my review of the FCC rate-setting forms filed by Time Warner and its predecessor in Indianapolis; (v) my review of Mr. Langhals' Affidavits; (vi) my review of the Time Warner Cost Study; and (vii) my prior experience with the establishment of regulated rates and related matters, including rate-related services for Bell Atlantic Corporation and GTE Service Corporation.

(R. 1258). Crane's affidavit connected her experience, the data, and her conclusions.

The declaration by Lehman recited his accounting experience analyzing "revenue and costs . . . ." and his previous experience in assessing "the reasonableness of fees charged subscribers for late payments by at least fifteen cable television systems. . . ." (R. 707). Lehman summarized the materials upon which he relied when he prepared his affidavit. He noted that he relied upon

> information regularly and reasonably relied upon by accountants and other financial experts to conduct the type of analysis and review that has been requested of me. My conclusions are also based upon my personal knowledge of the collection and accounting practices of the cable industry and other industries resulting from extensive experience analyzing the costs incurred and included in such practices.

(R. 708). Lehman included a spread sheet he prepared based upon the materials. Lehman's affidavit contains information regarding the materials and methodologies upon which he relied.

■ In making its determination to grant the motion to correct error with regard to the summary judgment, the trial court was provided with sufficient information to proceed with a reasonable amount of confidence that the principles used to form the experts' opinions within the designated affidavits are technically reliable. *Cf. Doe v. Shults–Lewis Child and Family Services, Inc.*, 718 N.E.2d at 751.

Time Warner also argues that Crane's opinion that Time Warner already recovers its late payment in its benchmark rate has no basis in the facts. Time Warner is incorrect. The Plaintiffs provided documentation to support the experts' opinions and the affidavits reveal the facts from which the opinions were formed.

Time Warner argues that no genuine issue of material fact can be left for resolution because the issue is one of pure law for the trial court to determine. *See Gershin*, 685 N.E.2d at 1128. Time Warner misses the mark. In *Gershin*, we reviewed a final determination by the trial court after a bench trial. Here, the preliminary facts upon which the legal question rests have not been determined, and are at the heart of the dispute at this stage in the proceedings. The preliminary facts to be resolved include, *inter alia*, whether Time Warner charges at the benchmark rate, and whether the benchmark rate includes the costs of collecting late payments. No legal conclusion can be made without the material, foundational issues. As the matter stands now, the trial court's ruling granting the motion to correct error had the effect of undoing the summary judgment. Accordingly, as yet, the trial court has not been given an opportunity to rule on the legal question.

We conclude that the affidavits and designated evidence by the Plaintiffs raise genuine issues of material fact as to the foundational questions. The evidence demonstrates that the trial court did not abuse its discretion in granting the motion to correct error with regard to the summary judgment on the Plaintiffs' claims for declaratory and injunctive relief. Therefore, we remand for further proceedings not inconsistent with this opinion.

Affirmed in part and reversed in part.

MATTINGLY, J., and BROOK, J., concur.