**CITY OF JEFFERSONVILLE,**
Indiana, Appellant–
Defendant,

v.

**HALLMARK AT JEFFERSONVILLE,**
L.P., Appellee–Plaintiff.

No. 10A01–1001–PL–22.

Court of Appeals of Indiana.

Nov. 15, 2010.

Larry O. Wilder, Jeffersonville, IN, Attorney for Appellant.

J. Spencer Harmon, Bruce B. Paul, Stites & Harbison, PLLC, Jeffersonville, IN, Attorneys for Appellee.

**OPINION**

BROWN, Judge.

The City of Jeffersonville, Indiana (the "City")[1] appeals the judgment of the trial court in favor of Hallmark of Jeffersonville, L.P. ("Hallmark"). The City raises two issues, which we revise and restate as whether the trial court erred in entering judgment for Hallmark.[2] We affirm.

The facts most favorable to the judgment follow. In late 2006, Hallmark was planning the development of three multifamily apartment buildings, two buildings of which were to include twenty-four units and one of which was to include thirty-two units. Hallmark inquired with the City about obtaining the proper permits, and on December 28, 2006, the City's engineer Robert Miller sent a fax to Hallmark which stated: "This is to advise that the tap-in fee will be $1,500 per unit for a total of $120,000." Plaintiffs Exhibit 1. On January 5, 2007, Hallmark submitted four payments totaling $120,025, including a $25.00 administrative fee. The City approved Hallmark's application to connect to the City's sewer system.

Hallmark later discovered that it had paid more than what it was required to pay under the City's ordinance related to sewer tap fees, as amended by Ordinance No.2004–OR–63, An Ordinance Amending Sewer Tap Fees ("Ordinance 63").[3] Spe-

---

1. The City established the Jeffersonville Board of Sewer Commissioners (the "Sewer Board") and delegated to the Sewer Board its powers under Ind.Code § 36–9–23 (relating to municipal sewage works). The "City" hereinafter may refer to either or both the City and the Sewer Board.

2. Hallmark on cross-appeal raises the issue of whether the court erred in denying Hallmark's motion for summary judgment. Because we affirm the judgment in favor of

Hallmark at trial, we need not address this issue.

3. There was testimony at trial that Hallmark discovered that it paid more than it was required to pay under Ordinance 63 after Hallmark's attorneys contacted Hallmark and asked it "to verify that [it] [was] charged correctly "and stated that" the City was trying to overcharge another apartment complex." Transcript at 95.

cifically, Hallmark believed that it was charged a sewer tap fee under Ordinance 63 associated with a "residential (single family) lot," but should have been charged instead with the sewer tap fee under Ordinance 63 associated with "[m]ulti-family units larger than a duplex." *See* Appellee's Appendix at 46–47. Thus, Hallmark believed that the total sewer tap or connection fee should have been $15,000.

On August 2, 2007, Hallmark submitted a claim for a refund in the amount of $105,000 to the City. On September 4, 2007, the Sewer Board denied Hallmark's claim for a refund.

On September 25, 2007, Hallmark filed a complaint against the City and the Sewer Board alleging that it paid $120,000 in sewer tap fees and that such payment constituted an overpayment of $105,000 and seeking a refund of $105,000. The City filed an answer on January 28, 2008. At a pre-trial conference on February 11, 2008, the court ordered that dispositive motions were due by April 1, 2008.

On April 1, 2008, Hallmark filed a motion for summary judgment, designation of evidence, and memorandum in support of its motion. On May 5, the City filed a "counter motion for summary judgment," designation of evidence, and memorandum in opposition to summary judgment and in support of the City's motion for summary judgment. Appellee's Appendix at 77. On May 14, 2008, Hallmark filed a motion to strike the City's summary judgment motion arguing that the motion was untimely. On May 22, 2008, Hallmark filed a reply in support of its summary judgment motion and response to the City's summary judgment motion. On July 2, 2008, the court held a summary judgment hearing and took the matter under advisement, and on August 27, 2008, the court issued an entry denying both parties' motions for summary judgment.[4]

On November 3, 2009, Hallmark filed a motion for judicial notice of facts, which the court granted. On November 5, 2009, a bench trial was held at which only one witness, Paul Widman, the president of Alsan Hallmark Division which was the affordable housing division of Hallmark, testified. The court took the matter under advisement, and on December 23, 2009, the court entered judgment in favor of Hallmark and issued findings of fact and conclusions of law which provided in part:

> This court now finds that based upon a clear and unambiguous reading of the Ordinance No.2004–OR–63 that the actual sewer tap-in fee owed by plaintiff was [$15,000] plus an administrative fee of $25.00 for 80 multi-family units. The court further finds that the calculation error was unintentional and resulted from an honest mistake by a respected City official. Neither the plaintiff nor defendants were consciously aware of this error at the time of payment. Either party certainly had the knowledge and sophistication to read the clear language of the city ordinance and to avoid the overpayment of $105,000.00 on January 5, 2007 that is the subject of this lawsuit.
>
> \* \* \* \* \* \*
>
> The court now finds that *Time Warner v. Whiteman*, 802 N.E.2d 886 (Ind. 2004)[, *reh'g denied*] is controlling precedent on [the] voluntary payment doctrine.
>
> \* \* \* \* \* \*
>
> Hallmark was required to pay a tap-in fee before receiving a permit and the benefit of city owned sewer services. This fee and permit process is absolutely

---

4. It does not appear that the court ruled on Hallmark's motion to strike.

required by city ordinance for the development of the apartment complex. To that extent, the tap-in fees paid by Hallmark were not voluntary. Hallmark should be entitled to the recovery of overpayment to the City as proven by a preponderance of the evidence and prejudgment interest of a sum certain.

The court finds that the voluntary payment doctrine in the legal precedent discussed below does not apply to bar a recovery by Hallmark.

\* \* \* \* \* \*

This court finds that Hallmark's payments were not voluntary under the holding of *Time Warner* and the voluntary payment doctrine does not prevent a recovery for overpayment. Hallmark is entitled to a judgment in its favor for the amount of $105,000.00 in overpayment with court costs and prejudgment interest of 8% beginning September 4, 2007 until paid.

Appellee's Appendix at 9–12.

 The issue is whether the trial court erred in entering judgment for Hallmark. The court entered findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000), *reh'g denied.* In our review, we first consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210. We give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially

to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind.1999).

The City argues that the Indiana Supreme Court has not eliminated the voluntary payment doctrine in matters that involve governmental entities, that "[t]he trial court, in reliance upon *Time Warner* [*Entertainment Co., L.P. v. Whiteman*, 802 N.E.2d 886 (Ind.2004), *reh'g denied,*] concluded that Indiana has abandoned the voluntary payment doctrine," and that "[t]his is incorrect as it relates to governmental entities." Appellant's Brief at 13. The City argues that Hallmark "had all of the facts before it when it [sic] voluntarily, intelligently and with the benefit of its specialized training, agreed to pay the tap-in fee as billed." The City argues that "[t]he facts of this case fit squarely within the exception carved out by our supreme court in *Time Warner*" and that "[t]he trial court's decision to order the City to repay Hallmark is contrary to the law as set forth in *Time Warner.*" *Id.* at 23. The City further argues that the court erred in interpreting the City's tap fee ordinance and that Hallmark waived its right to challenge the interpretation of the ordinance when it chose to pay the tap fee as invoiced.

Hallmark argues that the City is not protected by the voluntary payment doctrine with regard to its fee-for-service activities. Hallmark specifically argues that applying the voluntary payment doctrine to Hallmark's sewer fee would render Ind. Code § 36–9–23–28.5 void and that *Time Warner* compels the City to refund Hallmark's $105,000 overpayment. Hallmark also argues that the court correctly interpreted the ordinance and had the power to

order the City to enforce the ordinance and that Hallmark did not waive its right to ask the court to interpret the ordinance by paying the connection fee. In its reply brief, the City argues that Hallmark's efforts to challenge the City's ordinance are untimely and that the voluntary payment doctrine applies in this case.

### A. *Ordinance 63*

We will first address the interpretation of Ordinance 63. Initially, we note that the City does not appear to argue on appeal that the court erred in finding that the sewer tap or connection fee was governed by the provisions of Section 50.51(C) of Ordinance 63 related to multi-family units larger than a duplex. Nor does it dispute that two of the buildings included twenty-four units and that the third building included thirty-two units, or that the total sewer tap or connection fee as calculated under Section 50.51(C) was $15,000 for Hallmark's three buildings.[5]

Ordinance 63, which was in effect in January 2007, set forth the payment structure for sewer connection fees in the City of Jeffersonville. Specifically, Section 50.51 of Ordinance 63 provided in part:

(A) Except as outlined in subsection 1) below, a tap charge of one thousand five hundred dollars ($1,500.00) shall be levied against each residential (single family) lot, parcel of real estate, or building within the City's corporate boundaries that hereafter connects with the City's sewer system....

\* \* \* \* \* \*

(C) Tap fees for duplex multi-family units within the City's corporate boundaries shall be two thousand two hundred fifty ($2,250.00).... Multi-family units larger than a duplex shall incur an additional tap fee of one hundred-fifty [dollars] ($150.00) per unit up to ten (10)[sic] units. After ten (10) units, each additional unit shall be seventy-five [dollars] ($75.00).

Appellee's Appendix at 145–146.[6] For the term "Dwelling, Multifamily," the Jeffersonville Zoning Ordinance provided the following definition: "A residential building designed for or occupied by three (3) or more families...." Appellee's Appendix at 148.

When we construe a municipal ordinance, we apply the rules applicable to statutory construction. *City of Indianapolis v. Campbell*, 792 N.E.2d 620, 624 (Ind. Ct.App.2003), *reh'g denied.* The primary rule of statutory construction is to ascertain and give effect to the intent of the statute's drafters. *Id.* (citing *Hendrix v. State*, 759 N.E.2d 1045, 1047 (Ind.2001)). The best evidence of that intent is the language of the statute, and all words must be given their plain and ordinary meaning unless otherwise indicated by the statute. *Id.*

Our review of Ordinance 63 and the evidence presented at trial related to connection fees set forth in Ordinance 63, and we do not find the cases cited by the City related to setting rates to be instructive here. The City does not cite to relevant authority for the proposition that a court may not review or interpret a municipality's ordinance.

---

5. The City argues that Hallmark is prohibited from challenging the City's interpretation of its own ordinance and cites to *Farley Neighborhood Assoc. v. Town of Speedway*, 765 N.E.2d 1226 (Ind.2002), and other cases. However, *Farley* and the other cases cited by the City relate to the setting of utility rates and whether the actions of a municipality or other governmental body were taken pursuant to statutory authority. Hallmark did not challenge the City's utility rates or the sewer

6. In July 2007, the City passed "Ordinance No.2007–OR–36, An Ordinance Amending The Tap In Ordinance."

the buildings and units developed by Hallmark does not reveal that the trial court erred in determining that Hallmark should have been charged an amount equal to $15,000 to connect to the City's sewer system. In 2006, Hallmark inquired with the City regarding the sewer tap fee with respect to three multi-family apartment buildings. Two of the buildings would include twenty-four units, and the third building would include thirty-two units. Pursuant to the plain language of Section 50.51(C) of Ordinance 63, the sewer tap fee for each of the two buildings containing twenty-four units was $4,800, which is the sum of $2,250, $1,500 ($150 for each of the first ten units), and $1,050 ($75 for each of the remaining fourteen units). The sewer tap fee under Section 50.51(C) for the building containing thirty-two units was $5,400, which is the sum of $2,250, $1,500 ($150 for each of the first ten units), and $1,650 ($75 for each of the remaining twenty-two units). The sum of the tap fees for the three buildings was $15,000.[7] Concluding that the evidence supports the findings and the findings support the judgment on this issue, we affirm the court's findings and conclusion as to the proper total amount of $15,000 that Hallmark should have been assessed as a sewer tap or connection fee for the three buildings.

## B. *Waiver*

■ The City argues that "Hallmark has waived its right to challenge the interpretation of the City's tap-in fee ordinance that was applicable at the time it applied" and that "Hallmark paid the fee required by the City based upon the City's interpretation of the ordinance as applied to Hallmark." Appellant's Brief at 25. However, the City does not cite to relevant authority or point to the record to show that Hallmark was not entitled to seek the return or refund of any overpayment under Indiana statute. Ind.Code § 36–9–23–28.5 provides that "[a]n overpayment of sewer fees that remains unclaimed by a payor for more than seven (7) years after the termination of the service for which the overpayment was made becomes the property of the municipality." The overpayment here did not remain unclaimed for more than seven years. Based upon our review of this statute and the record, we cannot say that Hallmark waived its right to seek the return or refund of any overpayment of sewer fees.

## C. *The Voluntary Payment Doctrine*

■ The parties also present arguments regarding the applicability of the "voluntary payment doctrine" in this case and cite to the Indiana Supreme Court's opinion in *Time Warner,* 802 N.E.2d 886. In *Time Warner,* a cable television company assessed customers a late fee when payment was not received by the due date, and the customers filed lawsuits to recover

7. The trial court's conclusions provided that, with respect to both the twenty-four unit and the thirty-two unit buildings, the fee included "$2,250 for the building and the first unit" and "$150 for units 2 through 10." *See* Appellee's Appendix at 16. Thus the court did not state that a $150 fee was to be assessed for the first unit of each building. However, the court's findings that the total fee for each of the twenty-four unit buildings was $4,800 and the fee for the thirty-two unit building was $5,400 do include a $150 fee assessed for the first unit of each building. Although the calculations in the court's judgment supporting the court's conclusions did not include the $150 fee for the first unit of each building, the court's findings regarding the proper amount of total sewer tap or connection fees for each building and the aggregate tap or connection fee of $15,000 does include the $150 fee for the first unit of each of the three buildings and is supported by the plain language of Ordinance 63 and the evidence.

the late fees paid to Time Warner in excess of Time Warner's actual damages caused by late payment. 802 N.E.2d at 887–889. The trial court initially granted Time Warner's motion to dismiss and motion for summary judgment, concluding in part that the customers' claims for money damages were barred by the voluntary payment doctrine. *Id.* at 889. However, following a hearing on the customers' motion to correct error, the trial court vacated its earlier ruling and permitted the action to proceed on the merits. *Id.* On appeal, this court determined that the customers' claims for money damages were barred by the voluntary payment doctrine. *Id.* (citing *Time Warner Entertainment Co. v. Whiteman,* 741 N.E.2d 1265 (Ind.Ct. App.2001), *vacated in part by* 802 N.E.2d 886 (Ind.2004), *reh'g denied* ).

On transfer to the Indiana Supreme Court, Time Warner argued that the customers were not entitled to the repayment of any of the late fees paid because they paid those amounts voluntarily. 802 N.E.2d at 889. The Court initially reviewed hornbook law regarding voluntary payments and noted that a number of 19th century disputes were resolved using those principles. *Id.* at 889–890. The hornbook law propositions included that, "[a]s a general rule, money voluntarily paid with knowledge of all the facts, and without any fraud on the part of the party receiving payment, may not be recovered back even if the money was not legally due." *Id.* at 889. Also, under the old hornbook law propositions, voluntary payment made under a mistake or in ignorance of law could not be recovered, whereas money paid under a mistake of fact and which was not legally due could have been recovered. *Id.* at 889–890. After acknowledging contemporary scholarly opinion and the holdings of other jurisdictions, the Court adopted a more modern viewpoint that eliminates the

distinction between mistakes of fact and mistakes of law. *See id.* at 891.

The Court examined several factors in examining the voluntary payment doctrine. First, the Court observed that the customers were put in the position of having to pay in order to continue to receive cable service and thus were like the successful plaintiffs in the other Indiana cases of *Chicago, St. L. & P.R. Co. v. Wolcott,* 141 Ind. 267, 39 N.E. 451 (1895) (holding that alleged railway overcharges could be recovered), and *Lafayette & I.R. Co. v. Pattison,* 41 Ind. 312 (1872) (holding that alleged overcharges constituted payment by compulsion and may have been recovered back). Further, the Court approved of comments in the Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 2001) which "limits application of the voluntary payment doctrine to situations where a party has voluntarily paid a disputed amount." 802 N.E.2d at 891. The Court noted that there was at least an issue of fact as to whether the customers voluntarily paid the late fees in the face of a recognized uncertainty as to the existence or extent of an obligation to Time Warner. *Id.* at 892. The Court also stated that "as a general proposition, customers in a government created monopoly [i.e., cable] deserve special protection because they have nowhere else to go for cable services." *Id.* (citation and internal quotation marks omitted). The Court ultimately held that the "voluntary payments doctrine" was not applicable to preclude the customers from recovering their payments to Time Warner. *Id.* at 893.

The Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e (T.D. No. 1, 2001), cited favorably by the Court in *Time Warner,* provides in part:

The restitution claim to recover a payment in excess of an underlying liabili-

ty—a claim that is frequently described in terms of mistaken payment—meets an important limitation in the so-called voluntary-payment rule. The rule appears in frequent judicial statements to the effect that "money voluntarily paid with knowledge of the facts cannot be recovered back." Statements of this kind must be treated with caution. In a business setting, it is at least paradoxical to suppose that the overpayment of an asserted (or any payment of a nonexistent) liability could ever be "voluntary," and it is important to bear in mind that the proper operation of the voluntary-payment rule must be realistic rather than artificial. The rule does not, for example, impute knowledge of relevant circumstances of which the payor is not in fact aware, describing as "voluntary" a payment that was actually the consequence of negligence or inadvertence. When properly employed, a reference to "voluntary payment" is judicial shorthand for a truth of common experience: that a person must often choose to act on the basis of imperfect knowledge, accepting the risk that further information (acquired with the benefit of hindsight) may reveal the choice to have been less than optimal. A more appropriate statement of the voluntary-payment rule, therefore, is that money voluntarily paid *in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient* may not be recovered, on the ground of "mistake," merely because the payment is subsequently revealed to have exceed-

ed the true amount of the underlying obligation.

Here, Widman testified at trial that Hallmark could not have completed its development unless it paid the City the sewer connection fee. Specifically, Widman testified that "in [his] mind [he] didn't have a choice" and that he "had to go get a building permit, [ ] had to get a deal done ... was told [he had] to see [the City's engineer] and pay the sewer tap fee in order to get the building permit...." Transcript at 88. Widman later testified: "I didn't choose to pay the money[;] I was told I had to pay the money if I wanted to get my deal done." *Id.* at 89. Like the plaintiffs in *Time Warner,* and in *Wolcott* and *Pattison,* Hallmark was put in the position of having to make a payment in order to receive service; the fact that the City would not have approved Hallmark's application for access to the sewer system unless Hallmark paid the sewer tap fee under Ordinance 63 is similar to the fact in *Time Warner* that the customers were required to pay the cable company late fees in order to continue to receive cable service. The City did not elicit testimony from Widman or present other evidence which suggested that Hallmark would have been permitted to tap in to the City's sewer service or obtain the necessary building permits if it had not paid the sewer tap or connection fee required under Ordinance 63.[8] The City concedes that in order to build the apartments Hallmark needed to pay the City for the right to tap or connect to the City's wastewater treatment plant. We also note that the City

8. The City's counsel asked Widman: "Did Bob Miller [the City's engineer] put a gun to your head and said you must pay this fee? Did he?" and "Did anyone force you to pay that money by physical threat?" Transcript at 89–90. There was no evidence in *Time Warner* that the cable company threatened the customers with anything except the discontin-

uation of their cable services. Our reading of *Time Warner* and the cases and authority to which it cites does not indicate that a payment is voluntary as contemplated by the voluntary payment rule by virtue of the fact that there was no physical threat against the payor.

had a monopoly with respect to allowing connection to its wastewater sewage plant and that Hallmark, like the plaintiffs in *Time Warner*, had nowhere else to go for such services.

Moreover, the City does not point to the record to show, and our review does not reveal, that evidence was presented at trial that the amount of the sewer tap fee was in dispute at the time that the City sent a fax to Hallmark stating the amount of the fee or at the time Hallmark paid the fee to the City. Rather, the record suggests that a calculation error was made in computing the correct sewer tap fee under Ordinance 63.[9] Accordingly, the voluntary payment doctrine is inapplicable in this case.

To the extent that the City argues that the voluntary payment rule applies in this case because the City is a governmental entity, we disagree. The City cites to *City of Evansville v. Walker*, 162 Ind.App. 121, 318 N.E.2d 388 (1974), and other cases, and to language in *Time Warner*. In *City of Evansville*, the plaintiffs had paid fines to the city for parking violations committed on federal property. The plaintiffs discovered that the city did not have authority to impose fines for parking violations on federal property and sued to recover their fines. The court held that the plaintiffs were unable to recover because they "chose to plead guilty and voluntarily pay their fines under the mistaken belief that valid city ordinances covered the lots in question." *See* 162 Ind.App. at 123, 318 N.E.2d at 390. In *Time Warner*, in further support of its holding the Court noted that the principal policy justifications for applying the voluntary payment doctrine did "not seem to us to line up very well in this situation." *Time Warner*, 802 N.E.2d

at 892. One of those justifications was that "the doctrine allows entities that receive payment for services to rely upon these funds and to use them unfettered in future activities." *Id.* (quoting *Putnam v. Time Warner Cable of Southeastern Wis., L.P.*, 255 Wis.2d 447, 649 N.W.2d 626, 633 (Wis.2002) (citations omitted)). As to this justification, the Court stated that it "believe[d] the principle cited here was derived from cases like *City of Evansville* where the payee is a unit of government and presumably makes the unfettered' use of the funds on behalf of all of the citizens of its jurisdiction." *Id.* The Court went on to state that the "same rationale does not apply to a private business" in part because of the idea that a private party such as Time Warner in a free-market economy should not be allowed to take financial advantage of its own wrongdoing. *Id.* at 892–893 (citations omitted). We do not find the City's argument persuasive under the facts of this case.

The City did not present evidence regarding the use of the sewer connection fees collected or that use of the fees was unfettered. *See* Ind.Code § 36–9–23–29(d) (providing that "[t]he municipal legislative body shall determine by ordinance whether the proceeds of connection fees collected ... are to be used as: (1) net revenues of the sewage works; (2) payment toward the cost of construction of the works; or (3) payment toward the cost of improving the works in the future"). Moreover, Ind. Code § 36–9–23–29(a) provides that a sewer connection fee "must be based on the pro rata cost of constructing a local or lateral sewer sufficient to serve the property." The City here passed Ordinance 63, presumably to comply with the require-

9. The court's order found that "the calculation error was unintentional and resulted from an honest mistake by a respected City official. Neither [Hallmark] nor [the City] were consciously aware of this error at the time of payment." Appellee's Appendix at 9; Appellant's Appendix at 87. The parties do not challenge this finding on appeal.

ments of Ind.Code § 36–9–23–29(a). In addition, as previously mentioned, Ind. Code § 36–9–23–28.5 provides that an overpayment which remains unclaimed for more than seven years becomes property of the municipality. We can think of no policy reason consistent with these statutes to permit the City to keep Hallmark's overpayment—which was seven times the proper sewer connection fee amount under Ordinance 63—under the facts of this case, especially where the City would be taking financial advantage of its own calculation error. Under the circumstances of this case, and in light of the Indiana Code sections above governing sewer fees, we cannot say that the policy justifications referred to in *Time Warner,* and perhaps demonstrated to some extent by *City of Evansville* and other cases cited by the City, favor application of the voluntary payment rule, even though the City is a governmental entity.

For the foregoing reasons, we affirm the trial court's judgment in favor of Hallmark.

Affirmed.

DARDEN, J., and BRADFORD, J., concur.