OXFORD FINANCIAL GROUP, LTD. formerly d/b/a Oxford Financial Advisors Corporation and the Trust Company of Oxford, Appellants–Plaintiffs,

v.

Philip Richard EVANS, Leslie Denise Michael, John Thomas Trott, John Charles Wortman, The Valeo Financial Group, LLC., Appellees–Defendants.

No. 49A02–0303–CV–214.

Court of Appeals of Indiana.

Sept. 19, 2003.

E. Davis Coots, Elizabeth I. Van Tassel, Coots, Henke & Wheeler, P.C., Carmel, IN, Attorneys for Appellants.

John R. Maley, Larry A. Mackey, John T.L. Koenig, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BARNES, Judge.

### Case Summary[1]

Oxford Financial Group ("Oxford") appeals the length of a preliminary injunction entered by the trial court that prohibits Philip Evans, Leslie Michael, John Trott,

1. Oxford's motion for oral argument is hereby denied.

and John Wortman (collectively "the Defendants") from competing with or contacting clients of Oxford, the Defendants' former employer. We affirm in part and reverse and remand in part.

### Issue

The restated issue before us is whether the trial court erred in prohibiting the Defendants from competing with Oxford or soliciting Oxford clients for only twelve and eighteen months, respectively, instead of for eighteen and twenty-seven months, in alleged contravention of the parties' non-compete agreements.

### Facts

We note initially that resolving this case required much separating of the wheat from the chaff inserted by both parties in their briefs. Oxford provided a litany of allegedly "illegal" activity by the defendants that is irrelevant to the issue of the proper length of the preliminary injunction, and the defendants responded with allegations regarding Oxford's purported violations of various investment firm regulations and statutes and ethical improprieties that are similarly irrelevant. With apologies to former Tennessee senator Howard Baker, the central factual question in this case is what did Oxford know, and when did it know it?

The relevant facts are these. Oxford is a financial services firm based in Carmel that provides financial advice to wealthy clients. The Defendants were employed by Oxford as associate directors. As a requirement of employment, each Defendant signed a non-compete agreement. There are three relevant provisions of that agreement for purposes of this case. Paragraph 4 essentially prohibits competition with Oxford for twelve months post-employment by any ex-employee in any county where Oxford has at least five clients. Paragraph 5 prohibits any ex-employee from contacting any Oxford client "with respect to providing financial planning or investment management services" for eighteen months post-employment. Finally, paragraph 6(e) states:

> If Employee violates a restriction in paragraph 4 or 5 and if Oxford does not immediately learn of the violation, then the original time period for the restriction shall be enlarged and extended by adding to it (i) the number of days from the date of that violation to the date when Oxford learned or should have learned of that violation, and (ii) the number of days equal to 50% of the number of days in the original restriction period specified in this Agreement.

Appellant's Addendum to Brief, Tab D pp. 3–4.

In late 2001, the Defendants began making plans to leave Oxford and start their own financial services firm. Oxford somehow became aware of these plans. On April 17, 2002, Oxford president Christopher LaMothe confronted defendant Michael about whether she was involved in a plan with others to leave Oxford and begin working for a competitor. When Michael failed to directly confirm or deny that information, she was immediately fired.[2] Thereafter, defendants Trott and Evans were also asked whether they planned to leave Oxford, and they denied that they were planning to do so. However, on April 19, 2002, defendants Trott, Evans, and Wortman submitted their resignation from Oxford through their attorney, for the stated reason that they were concerned they might be exposed to criminal and/or civil liability for alleged illegal activities by Oxford.

Oxford and the Defendants thereafter entered into negotiations regarding the

---

**2.** LaMothe testified that Michael was also terminated because of her poor job performance.

non-compete agreements. On May 3, 2002, counsel for the Defendants sent a letter to counsel for Oxford, which stated in part:

> My clients have not violated any term of the Confidentiality Agreement and Agreement Not To Compete and will not engage in conduct violating the Agreement during meaningful negotiations between the parties (the stand still period you referenced).... We would appreciate a response to our settlement proposal by the close of business, Tuesday, May 7, 2002, that Oxford release my clients from all restrictive agreements in exchange for my clients' release of Oxford for its acts detrimental to them and a mutual confidentiality agreement.

Addendum to Appellant's Br., Tab A. There evidently was no positive response to the settlement proposal.

On May 6, 2002, the Defendants filed articles of organization for The Valeo Financial Group, LLC. On May 17, 2002, the Defendants registered with the Indiana Secretary of State's Securities Division to be able to provide financial advisory services. At some point, although there is no evidence in the record as to precisely when, it appears the Defendants contacted Oxford clients about their departure from Oxford. On June 14, 2002, LaMothe signed a complaint against the Defendants for violating the non-compete agreements and seeking the preliminary injunction that is at issue today.[3] After

the complaint was filed on June 18, 2002, Oxford received letters from some of its clients giving notice that they were terminating their relationship with Oxford and hiring the Defendants.

On September 4, 2002, after conducting an evidentiary hearing, the trial court entered a preliminary injunction providing, inter alia, that the Defendants could not compete with Oxford in certain counties in Indiana, Illinois, and Florida, and that they could not solicit any current Oxford clients. The trial court placed no time limit on these prohibitions. The Defendants then filed a motion to correct error, specifically requesting a time limit for the non-compete/no solicitation provisions of the injunction. After a change of judge, the trial court eventually modified the injunction on March 17, 2003, to provide that the Defendants were not enjoined from competing with Oxford in the named counties after May 17, 2003, and were not enjoined from contacting Oxford clients after November 17, 2003. These time limitations were twelve months and eighteen months, respectively, after the Defendants registered with the Secretary of State, May 17, 2002. In placing these time limitations, the trial court rejected Oxford's argument that paragraph 6(e) of the non-compete agreement required the injunction's length to be eighteen and twenty-seven months, respectively, or an increase of fifty percent over the standard limitation period. Oxford now appeals.

---

**3.** The complaint and the initial request for a preliminary injunction were not transmitted to this court. We also have not received a copy of the Defendants' motion to correct error filed after the injunction was granted, nor Oxford's response to that motion, which led to the modification of the injunction we are asked to consider today. These documents would have been helpful to this court, much more so than the materials regarding the Defendants' pre-termination activities or Oxford's alleged illegal/unethical activities

that have been provided to us. Additionally, these pleadings arguably were required to be made part of Oxford's appendix. *See* Ind. Appellate Rule 50(A)(2)(f) (requiring appellant's appendix to contain "pleadings and other documents from the Clerk's Record in chronological order that are necessary for resolution of the issues raised on appeal"). We considered issuing a writ of certiorari to the trial court to obtain these documents, but given the time-sensitive nature of this appeal we have declined to do so.

## Analysis

■ As a preliminary matter, the Defendants claim this court lacks jurisdiction to entertain this interlocutory appeal, because it is not an appeal as of right and Oxford did not follow the proper procedures to perfect a discretionary interlocutory appeal. Indiana Appellate Rule 14(A)(5) provides that a party may take an appeal as of right from an order "[g]ranting or refusing to grant, dissolving, or refusing to dissolve a preliminary injunction...." The Defendants claim that the order Oxford appeals, which modified a preliminary injunction by placing a time limit on certain parts of it, does not fall under the above rule. We disagree. By its order, the trial court effectively dissolved part of the injunction, changing it from one of indefinite duration to one with a definite ending point. We also note that the motions panel of this court has already ruled that we have jurisdiction over this appeal. Although we may reconsider a ruling by that panel, we decline to do so in the absence of clear authority establishing that it erred as a matter of law. There is no such authority in this case, and we will not revisit the motion panel's ruling.

■ Aside from the jurisdictional question, the first disputed issue in this case that we must resolve is the appropriate standard of review. The Defendants claim that the standard governing rulings on motions to correct error should apply because Oxford technically is appealing from the granting of such a motion. "A decision to grant a motion to correct error is reviewed for an abuse of discretion." *Time Warner Entertainment Co., L.P. v. Whiteman,* 741 N.E.2d 1265, 1270 (Ind.Ct. App.2001). Additionally, the issuance of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion. *Apple Glen Crossing, LLC v. Trademark Retail, Inc.,* 784 N.E.2d 484, 487 (Ind.2003). The trial court here also made findings of fact and conclusions thereon when it first issued the preliminary injunction, as required, and also entered partial findings on the motion to correct error. When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment and the trial court's judgment will be reversed only when clearly erroneous. *Wenzel v. Hopper & Galliher, P.C.,* 779 N.E.2d 30, 36 (Ind.Ct.App. 2002), *trans. denied.* Findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* "To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility." *Id.*

■ Oxford contends that we should review the trial court's decision setting a time limit on part of the preliminary injunction de novo. It argues this is the appropriate standard of review because the case involves the interpretation of an unambiguous contract and the application of undisputed facts to that contract. "Our standard of review of the interpretation of an unambiguous contract is de novo." *McLinden v. Coco,* 765 N.E.2d 606, 612 (Ind.Ct.App.2002). Additionally, if there is a contract ambiguity that arises solely because of the language used in the contract and not because of extrinsic facts, then its construction is still purely a question of law. *Id.*

■ We conclude that to the extent the trial court was required to find facts with respect to what the proper length of the injunction should be—i.e., what did Oxford know, what should it have known,

and when did Oxford know it or when should it have known it—the traditional deferential standard of review where facts have been found should apply. To the extent the trial court's decision turned on contract interpretation—either as an unambiguous contract or an intrinsically ambiguous one—the standard of review should be de novo. Additionally, it must be kept in mind that Oxford, as the party seeking a preliminary injunction, had the burden of proving that it was entitled to such relief by a preponderance of the evidence. *Boatwright v. Celebration Fireworks, Inc.*, 677 N.E.2d 1094, 1096 (Ind.Ct. App.1997).

 Turning first to the contract interpretation issue, one of Oxford's claims is that the trial court erred in construing the contract to mean that if Oxford immediately knew *or should have known* of a breach of the non-compete agreement, then paragraph 6(e)'s lengthening provision cannot apply. Specifically, Oxford contends that it is not entitled to the longer non-compete period under subsection (ii) of paragraph 6(e) *only* if it has immediate *and actual* knowledge of a breach. Oxford's argument is based on the fact that paragraph 6(e) contains two methods for calculating the extension of the non-compete period:

> [I]f Oxford does not immediately learn of [a] violation, then the original time period for the restriction shall be enlarged and extended by adding to it (i) the number of days from the date of that violation to the date when Oxford learned or should have learned of that violation, and (ii) the number of days equal to 50% of the number of days in the original restriction period specified in this Agreement.

Appellant's Addendum to Brief, Tab D pp. 3–4. Oxford claims it is only seeking an extension under part (ii) above, therefore, the "should have learned" language of part

(i) does not apply and the only restriction on claiming an extension under part (ii) is if Oxford has immediate, actual knowledge of a breach.

 Oxford argues that this part of the contract is unambiguous in this respect. A contract is ambiguous only if reasonable persons would differ as to the meaning of its terms. *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind.2002). In interpreting an unambiguous contract, a court gives effect to the parties' intentions as expressed in the four corners of the instrument, and clear, plain, and unambiguous terms are conclusive of that intent. *Hyperbaric Oxygen Therapy Systems, Inc. v. St. Joseph Medical Center of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind.Ct.App. 1997), *trans. denied.* Courts may not construe clear and unambiguous provisions, nor may it add provisions not agreed upon by the parties. *Id.* at 247–48.

 Oxford's claim of unambiguousness appears to rest on the premise that the first part of paragraph 6(e) and subsection (ii) of that paragraph should be read apart from subsection (i). In other words, Oxford implies, if it only wishes to extend the non-compete period under subsection (ii) of paragraph 6(e), then subsection (i) with its reference to when Oxford "should have learned" of a breach must be ignored or excised from the contract. It is axiomatic, however, that when interpreting a contract courts are compelled to view a particular section as a whole rather than examine each phrase therein in isolation. *Id.* at 249. Particular words and phrases cannot be read alone and the parties' intentions must be determined by reading the contract as a whole. *Id.* Therefore, it would be improper to accept Oxford's invitation that because it is only relying upon subsection (ii) of paragraph 6(e), subsection (i) with its "should have learn[ed]" language ought to be ignored. This is

especially true because subsections (i) and (ii) are joined by the conjunctive "and," indicating that the two subsections are to be read together and harmonized.

Because subsection (i) should not be excised when construing the entirety of paragraph 6(e), we conclude that the paragraph is ambiguous with respect to whether Oxford may claim the time extension of subsection (ii) if it lacks immediate and actual knowledge of a breach of contract, regardless of whether it should have known of a breach, or if Oxford is precluded from seeking a time extension if it immediately should have known of a breach. We hold that the latter construction, which the trial court employed, is appropriate.

This particular ambiguity in the contract is a patent one, meaning it is apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning. *Eckart v. Davis*, 631 N.E.2d 494, 497 (Ind.Ct.App.1994). "Extrinsic evidence is not admissible to explain or remove a patent ambiguity." *Id.* As such, resolution of this ambiguity presents a question of law. *Boswell Grain and Elevator, Inc. v. Kentland Elevator and Supply, Inc.*, 593 N.E.2d 1224, 1227 (Ind. Ct.App.1992). In interpreting a contract, the courts seek to ascertain the intent of the parties and will accept an interpretation of the contract that harmonizes its provisions as opposed to one which causes the terms to be conflicting. *Id.* at 1226–27. "An ambiguous contract will be construed against the party who drafted it." *Id.* Additionally, non-compete agreements are not generally favored in Indiana because they restrain trade, and such agreements will be construed against the one seeking the restraint. *Franke v. Honeywell, Inc.*, 516 N.E.2d 1090, 1092–93 (Ind. Ct.App.1987), *trans. denied* (1988).

Here, as noted, subsections (i) and (ii) of paragraph 6(e) are joined by the word "and," indicating that the remedies for lengthening the period of non-competition by an ex-employee that they provide are complementary, not exclusive of each other. Subsection (i) clearly indicates that the starting point for the remedy it contains is the date on which Oxford knew or should have known of a breach by an ex-employee, which in turn clarifies that the phrase "immediately learns" in the first part of the paragraph is the time Oxford knew or should have know of a breach. It would be internally inconsistent, and unharmonious, for Oxford to be able to invoke the remedy contained in subsection (ii) if it lacks immediate and actual knowledge of a breach, even if it immediately should have known of a breach. Furthermore, as the drafter of the agreement and the party seeking to extend a restraint on trade, we must resolve this ambiguity against Oxford so that it is precluded from extending the non-compete agreement's time period under either subsection (i) or (ii) if it immediately knew *or* should have known of a breach.

This brings us to the next unavoidable ambiguity in paragraph 6(e): the meaning of the word "immediately." Oxford quotes Black's Law Dictionary for the proposition that "immediately" means "without interval of time, without delay, straightaway, or without any delay or lapse of time [and is] stronger than the expression 'within a reasonable time.'" Appellant's Br. p. 23 (quoting Black's Law Dictionary (6th ed.1990)). This definition, however, still does not clarify what the word "immediate" meant in this contract and whether Oxford had "immediate" knowledge of a breach in this case. We believe it would be absurd to conclude that the extended restraint period would come into play if Oxford did not learn or have

reason to learn of a breach of the non-compete agreement within one second, one minute, or even one hour of its occurring. At the outer limit, learning of a breach six months after it occurred would likewise not appear to be "immediate" knowledge. In between those extremes, it is exceedingly difficult to assign a precise value to what constitutes "immediate" knowledge of a breach.

■ Contrary to Black's Law Dictionary, Indiana courts have found an implied "reasonableness" time requirement when they have been called upon to define the word "immediate" in a statute or contract. Many years ago, this court observed:

> The term "immediate," however, is one admitting of a wide variety of definitions. It is the indicium of a time interval as well as that of an interval of space. It can indicate relativity or continuity. It is the opposite of ultimate. It is qualitative, not quantitative, relative, not absolute. In its strictest sense as a time referent it means the present instant, instantaneously, without appreciable lapse of time.... [But][i]f, as appellant urges, the term "immediate" as used in the statute is a time referent then his argument falls under the weight of authority in this and other states for it has been held generally that the construction of the term when it occurs in contracts or in statutes is, that the act referred to shall be accomplished *within such convenient time as is reasonably requisite.*

*Gross Income Tax Dept. of Treasury v. Harbison–Walker Refractories Co.,* 113 Ind.App. 695, 699–700, 48 N.E.2d 834, 836 (1943) (emphasis added). Also, when determining whether an insured has given "prompt" or "immediate" notice of a claim to an insurer as required by an insurance contract, courts must evaluate whether the notice was given within a "reasonable" time by considering the purposes for which the notice is given and the circumstances of the particular case. *See Sutton v. Littlepage,* 669 N.E.2d 1019, 1023 (Ind.Ct. App.1996). Finally, use of the word "immediate" in this contract appears to be a latent ambiguity that arises only upon attempting to implement the contract, and the meaning of which can only be determined by reference to extrinsic evidence. *See Eckart,* 631 N.E.2d at 497–98. Thus, it is clear that the meaning of the word "immediate" in this contract and whether Oxford had "immediate" knowledge of a breach are fact-sensitive questions that can only be answered by carefully evaluating the facts and circumstances surrounding the Defendants' departure from Oxford, their alleged breaches of the non-compete agreements, and Oxford's knowledge, actual or constructive, of the Defendants' activities. It is also clear that "immediate" does not mean instantaneous but to some other undefined time period.

In its original preliminary injunction order the trial court made no findings of fact with respect to when the Defendants first breached paragraphs four and or five of the non-compete agreements or when Oxford first learned or should have learned of any breach. When it modified the injunction to place the twelve and eighteen month time restrictions, the trial court found that Oxford "did not at the injunction hearing provide evidence that would trigger the application of paragraph 6(e)" of the non-compete agreement. Addendum to Appellant's Br., Tab F p. 2. It also found "there was evidence that Oxford *knew or should have had reason to know* that (a) Defendant Michael had the intention to compete in violation of the restrictive covenant when it fired her on April 17, 2002 and (b) Defendants Trott, Wortman and Evans were also planning to compete with Oxford in violation of the restrictive

covenant following their resignation on April 19, 2002." *Id.* at pp. 2–3 (emphasis in original).

Even assuming that the word "immediately" could be given a definable scope, or a scope that a trial court could assign after considering the surrounding facts and circumstances, as reflected by the trial court's findings Oxford has presented no evidence of (1) when the Defendants actually breached paragraph four or five of the non-compete agreement by actually providing financial advisory services in a prohibited area or by soliciting Oxford clients; or (2) when Oxford actually learned of the breach or breaches. Thus, there is no way to gauge whether Oxford had "immediate" knowledge of any breach, however that word could be defined. On this issue, the Defendants point out that Oxford admittedly fired Michael at least partially because she was planning to leave the firm and compete with it and that the three other Defendants left two days later, even after two of them informed Oxford that they planned to stay. These facts clearly put Oxford on notice that "mischief was afoot" among all four Defendants, and indeed the parties soon entered into negotiations regarding the non-compete agreements. The Defendants also point out that they incorporated a business on May 6, 2002, and registered with the Secretary of State on May 17, 2002, which were matters of public record.

Oxford, however, claims it was led into a false sense of security by the negotiations because of the letter from Defendants' counsel that they would not violate the non-compete agreements "during meaningful negotiations between the parties (the stand still period you referenced)." Addendum to Appellant's Br., Tab A. Oxford fails to specifically define the vague phrase "meaningful negotiations." One possible interpretation, especially from the Defen-

dants' standpoint, is that that period ended when Oxford failed to accept the Defendants' settlement proposal by the end of business on May 7, 2002, as referenced in the letter. Additionally, Oxford has never indicated when it believed "meaningful negotiations" had ended and it began preparing a lengthy complaint and other litigation pleadings in anticipation of suing the Defendants.

Oxford also argues that even if it had knowledge that the Defendants had incorporated a financial advisory corporation and registered to provide financial advice services with the Secretary of State and that at one time they were planning to compete with Oxford, this does not equate with knowledge that the Defendants *actually* competed with Oxford in a prohibited county or improperly contacted Oxford clients. Thus, Oxford contends, its knowledge of these facts does not mean it had knowledge that the Defendants breached their covenants not-to-compete. This argument, however, does not change the fact that Oxford has not revealed nor presented any direct evidence of when it acquired knowledge of the Defendants' breaches or when such breaches occurred. It asserts in its brief that it only learned of the Defendants' actual competition in mid to late June, when it received letters from clients indicating that they were leaving Oxford and hiring the Defendants. This occurred after Oxford filed its complaint, which was signed by LaMothe on June 14, 2002, and it seems counter-intuitive to say that Oxford only obtained knowledge of these breaches after it made the decision to sue the Defendants. Certainly, it was reasonable for the trial court to infer that Oxford obtained knowledge of the Defendants' breaches sometime before it decided to file suit.

Oxford clearly had an opportunity to establish the date on which it obtained

knowledge of the Defendants' actual breaches when LaMothe testified at the preliminary injunction hearing, but no question to that effect was ever asked of him. Additionally, Oxford also admitted in its "Motion for Entry of Order Simplifying Issues for Preliminary Injunction Hearing" that "[a]round [April 14, 2002], Oxford learned that Michael had told clients she and others planned to leave and compete." Appellee's App. p. 355. This arguably goes beyond knowledge of the Defendants' and especially Michael's *plan* to compete, but by actually contacting clients and informing them of this plan appears to run directly afoul of the non-compete agreement. Additionally, Oxford seems to have had "immediate" knowledge of this breach.

The facts and circumstances surrounding what occurred between the Defendants' leaving Oxford in mid-April 2002 and the filing of the lawsuit in mid-June 2002 are clear as mud as far as what the Defendants did, what Oxford knew, and when it knew it. Oxford has never posited or presented evidence of a specific date on which it knew or should have known that the Defendants breached paragraphs four and/or five of the non-compete agreement, nor a date on which such breach or breaches actually occurred. We conclude that Oxford was required at a minimum to do so, because it was the party seeking the preliminary injunction, the party seeking to restrain trade, and the party seeking to have an ambiguous contract provision construed in its favor. Otherwise, it is impossible to determine whether Oxford did not have "immediate" knowledge of any breaches of the non-compete agreement so as to bring the longer time restriction of paragraph 6(e) into play. Oxford gave the trial court nothing to go on; that court did not err in ruling that Oxford failed to demonstrate that paragraph 6(e) applied in this case.

Finally, the Defendants argue in their brief that the trial court erred in making May 17, 2002, the starting date for the twelve and eighteen months restrictions on competitive activities or client solicitation, respectively.[4] The trial court chose this date because it was the date on which the Defendants registered with the Secretary of State and was the earliest date on which they legally could have competed directly with Oxford. The non-compete agreement, however, marks the starting date for the twelve and eighteen month restrictions as the date of termination. Those dates were April 17, 2002, for Michael and April 19, 2002, for Trott, Wortman, and Evans. "[I]n any situation, non-competition agreements ... will never be extended beyond the express terms of the agreement." *Franke*, 516 N.E.2d at 1092–93. Thus, the Defendants are correct that the starting dates for the injunction's time period must be the dates of their termination. The twelve-month injunction against competitive activity already expired in May 2003. However, the eighteen-month injunction against Oxford client solicitation is not set to expire until November 17, 2003. That is approximately one month too long. As for Michael, she should be free to contact Oxford clients after October 17, 2003; as for Evans, Trott, and Wortman, they should be free to do so after October 19, 2003. These dates are eighteen months after their terminations and are the full extent of the restraint on trade provided for by the non-compete agreements, which cannot be extended. We reverse the trial court's modification of the preliminary injunction to this extent and remand with instructions to correct the injunction accordingly.

4. Oxford does not respond to this claim in its reply brief.

## Conclusion

Paragraph 6(e) is ambiguous, and we construe it as precluding Oxford from lengthening the time period of the non-compete restrictions in any way if it immediately knew *or* should have known of a breach of the non-compete agreement. We also conclude that Oxford failed to present any evidence by which it could be determined whether it had "immediate" knowledge, actual or constructive, of such a breach by any of the Defendants. The trial court did not err in only prohibiting the Defendants from competing with Oxford or contacting Oxford clients for twelve and eighteen months respectively, instead of for eighteen and twenty-seven months. However, we do direct the trial court to reduce the length of the remaining non-solicitation injunction in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.

DARDEN, J., and MAY, J., concur.