**NOBLE ROMAN'S, INC., Appellant–Defendant,**

v.

**PIZZA BOXES, INC., Appellee–Plaintiff.**

No. 49A02–0411–CV–995.

Court of Appeals of Indiana.

Oct. 26, 2005.

Jeffrey R. Gaither, Bryan H. Babb, Marisol Sanchez, Bose McKinney & Evans, Indianapolis, for Appellant.

Brian D. Gwitt, Kimberly A. Metzger, Brian E. Bailey, Ice Miller, Indianapolis, for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Noble Roman's, Inc. appeals from the trial court's entry of summary judgment in favor of Pizza Boxes, Inc. in this breach of contract action. Noble Roman's presents a single dispositive issue for our review, namely, whether the trial court erred when it did not enter summary judgment for Noble Roman's.

We reverse and remand with instructions.

### FACTS AND PROCEDURAL HISTORY

Noble Roman's is a franchisor of pizza restaurants, but the company does not own or operate any restaurants. Noble Roman's franchisees order supplies from distributors approved by Noble Roman's. Pizza Boxes is a broker that acts as an intermediary for vendors who manufacture pizza boxes.

In 2002, William Gilbert, then-Director of R & D and Distribution for Noble Roman's, e-mailed Michael Rosenberg, Vice President of Pizza Boxes, regarding Noble Roman's interest in "clamshell" boxes for use in a new "pizza-by-the-slice" program. Gilbert stated that the "[e]stimated usage at this stage is from 400,000 to a million units per year to start." Appellant's App. at 184. In response, Rosenberg telephoned Gilbert, and, after further discussion, Gilbert asked Rosenberg to send him box samples and a price list.

After Noble Roman's had approved the box design, Gilbert and Rosenberg discussed details of the proposed purchase. Gilbert explained that the pizza-by-the-slice program was just getting started at one of its franchise locations but he anticipated that other locations would implement the program over time. Gilbert and Rosenberg agreed that 2.5 million boxes would be needed annually; that Multifoods, Noble Roman's distributor, would submit orders for the boxes and pay the invoices; and that Multifoods would pick up the boxes after the orders were filled. Accordingly, Rosenberg sent Gilbert a confirming letter on November 1, 2002, which stated:

Dear Bill,

Please sign in the space below to confirm the following order:

Item: 18/6 Slice Box 220/case

Quantity: 2,500,000

Print: Two colors

Price: $101.45/M

FOB: Bakersfield or Stockton, Ca. (in trailer load quantity-approx. 230,000 per load)

To be picked up by Multifoods. PBI remits invoice Multifoods.

Extras for printing preps are included at $4,500 ($1.80/M) and amortized over the entire order. In the event that the total of 2.5 million boxes are not manufactured, Noble Roman's is responsible for any portion of the prep charges remaining.

Appellant's App. at 193. Gilbert signed and dated the letter and returned it to Rosenberg.

On its own initiative, Pizza Boxes, through its vendor, Dopaco, Inc., manufactured 519,200 boxes in anticipation of Multifoods' future orders. Multifoods submitted an initial purchase order to Pizza Boxes for sixty cases (12,000 boxes), and Multifoods paid Pizza Boxes for that order. But after the initial order, Multifoods did not order any more boxes. When Rosenberg called the buyer at Multifoods to inquire why it had not ordered more boxes, he was told that the franchisees were "not using this product." Appellant's App. at 177.

Pizza Boxes then asked Noble Roman's to pay for approximately 500,000 boxes that Pizza Boxes had made but that Multifoods had not ordered. Noble Roman's responded that it was "a franchisor and not an operator of restaurants," that it specifies and arranges for the manufacture of products and supplies sold by its franchisees, and that Noble Roman's does not purchase any supplies or products. *Id.* at 201. Noble Roman's further explained

that "[o]nce Noble Roman's includes a product or supplies in our specifications, then any purchase order is signed by the distributor who buys all of the products and supplies and distributes them to the franchisees who sign purchase orders with the distributor." *Id.*

Pizza Boxes filed a complaint against Noble Roman's alleging breach of contract. Pizza Boxes then filed a motion for summary judgment. In its memorandum in opposition to that motion, Noble Roman's urged the trial court to enter summary judgment in its favor pursuant to Indiana Trial Rule 56(B). Following a hearing, the trial court granted Pizza Boxes' summary judgment motion and entered judgment against Noble Roman's in the amount of $54,901.44 for the "unpaid inventory and tooling charges," plus prejudgment interest.[1] This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing summary judgment, this court views the same matters and issues that were before the trial court and follows the same process. *Estate of Taylor ex rel. Taylor v. Muncie Med. Investors, L.P.,* 727 N.E.2d 466, 469 (Ind.Ct. App.2000), *trans. denied.* We construe all facts and reasonable inferences to be drawn from those facts in favor of the nonmoving party. *Jesse v. American Cmty. Mut. Ins. Co.,* 725 N.E.2d 420, 423 (Ind.Ct. App.2000), *trans. denied.* Summary judgment is appropriate when the designated evidence demonstrates that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). The purpose of summary judgment is to terminate litigation about which there can be no material factual dispute and which can be resolved as a matter of law. *Zawistoski v. Gene B. Glick Co.,* 727 N.E.2d 790, 792 (Ind.Ct.App.2000).

Noble Roman's contends that the trial court erred when it entered summary judgment in favor of Pizza Boxes. In particular, Noble Roman's maintains that its only obligation under the November 1, 2002 letter was to pay the "printing prep" charges remaining in the event that Pizza Boxes did not manufacture 2.5 million boxes. We must agree.

▆ Initially, we note that Pizza Boxes' complaint suggests that the November 1, 2002 letter is a purchase order, that is, "[a] document authorizing a seller to deliver goods with payment to be made later." *See* BLACK'S LAW DICTIONARY 1248 (7th ed.1999). But the plain and ordinary meaning of the letter shows that it is a requirements contract. *See* Ind.Code § 26-1-2-306. The letter is not an order for 2.5 million boxes but, on its face, contemplates the possibility that not all 2.5 million boxes would be manufactured. Thus, it is not a purchase order. And despite the inclusion in the letter of a specific estimate of quantity, it is clear that there was no meeting of the minds on how many boxes Pizza Boxes would ultimately produce under the requirements contract.[2] *See Empire Gas Corp. v. Amer-*

---

1. The trial court also ordered Noble Roman's to pay $575 for "unpaid freight charges" for boxes shipped in January 2003, but Noble Roman's does not dispute that part of the summary judgment entry.

2. Under a requirements contract, "the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of

a determination to liquidate or discontinue the business." *See Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333, 1337–38 (7th Cir.1988); *see also Indiana–American Water Co. v. Town of Seelyville,* 698 N.E.2d 1255, 1260 (Ind.Ct.App.1998). As such, if Multifoods' decision to stop ordering the boxes was made in good faith, which is a ques-

*ican Bakeries Co.*, 840 F.2d 1333, 1336 (7th Cir.1988) (holding contract was a requirements contract despite inclusion of specific estimate of quantity where contract also showed parties contemplated purchase of "more or less" of product).

Generally, construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Rogier v. American Testing and Eng'g Corp.*, 734 N.E.2d 606, 613 (Ind.Ct.App.2000), *trans. denied.* However, if the terms of a written contract are ambiguous, it is the responsibility of the trier of fact to ascertain the facts necessary to construe the contract. *Id.* Consequently, whenever summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain or that the contract ambiguity, if one exists, can be resolved without the aid of a factual determination. *Id.*

Noble Roman's contends, and we agree, that the letter is unambiguous and provides that it is only responsible for the unpaid "printing prep" charges "[i]n the event that the total of 2.5 million boxes are not manufactured[.]" Appellant's App. at 193. In interpreting an unambiguous contract, a court gives effect to the parties' intentions as expressed in the four corners of the instrument, and clear, plain, and unambiguous terms are conclusive of that intent. *Oxford Financial Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1142 (Ind.Ct.App. 2003). Particular words and phrases cannot be read alone, and the parties' inten-

tions must be determined by reading the contract as a whole. *Id.*

The terms of the November 1 letter show that: (1) Multifoods would pick up the boxes; (2) Pizza Boxes would remit the invoices to Multifoods; and (3) Noble Roman's was responsible for "any portion of the [printing] prep charges remaining" in the event that not all 2.5 million boxes were manufactured. *Id.* While the terms regarding quantity and price might, at first glance, suggest that the letter is a purchase order from Noble Roman's for 2.5 million boxes,[3] when the letter is read as a whole it shows that it is a requirements contract under which Multifoods, not Noble Roman's, is the purchaser. In effect, Multifoods is a third-party beneficiary of the contract, in that Noble Roman's established the specifications, arranged for the manufacture, and negotiated the price of the boxes for the benefit of Multifoods.

In addition, the parties' course of performance shows that Pizza Boxes did not expect that Noble Roman's would be responsible for paying for the boxes. Indiana Code Section 26–1–2–208 provides in relevant part:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

Indiana Code Section 26–1–2–202 provides in relevant part:

tion of fact, Pizza Boxes could not claim damages. *See id.* at 1261 (observing "if the buyer has a legitimate business reason for eliminating its requirements, as opposed to a desire to avoid its contract, the buyer acts in good faith.").

**3.** Pizza Boxes only seeks to recover the cost of the approximately 500,000 boxes that were manufactured but not purchased.

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but *may be explained or supplemented:*

(a) by course of dealing or usage of trade (IC 26–1–1–205) or *by course of performance* (IC 26–1–2–208)[.]

(Emphases added). Thus, when contracting parties reduce their understandings to written form and intend that writing as the final expression of their contract, evidence of course of performance is properly admitted to supplement the otherwise integrated agreement of the parties only when such evidence does not contradict that agreement. *See Warrick Beverage Corp. v. Miller Brewing Co.,* 170 Ind.App. 114, 352 N.E.2d 496, 501 (1976).

Here, the requirements contract involved "repeated occasions for performance" in that not all 2.5 million boxes would be ordered, manufactured, and purchased at once. Multifoods submitted a purchase order for sixty cases to Pizza Boxes; Pizza Boxes submitted an invoice to Multifoods; and Multifoods paid Pizza Boxes for the boxes.[4] When Multifoods

did not submit any subsequent orders, Rosenberg looked to Multifoods for an explanation and telephoned its buyer to ask why no other orders had been submitted. The conduct of Multifoods in submitting the order to Pizza Boxes and paying Pizza Boxes, and Pizza Boxes' conduct in submitting the invoice to Multifoods and contacting Multifoods to inquire about additional orders, establish a course of performance between them, consistent with the terms of the letter, all of which shows that Multifoods is the purchaser. Pizza Boxes did not suggest that the November 1, 2002 letter obligated Noble Roman's until it realized that Multifoods was not going to submit any additional purchase orders.

Finally, if there were any latent ambiguity in the letter concerning the identity of the purchaser, and if resort to extrinsic evidence were required, the undisputed extrinsic evidence shows that the parties intended that Multifoods would purchase the boxes. *See Adams v. Reinaker,* 808 N.E.2d 192, 196 (Ind.Ct.App.2004) (reiterating rule that extrinsic evidence admissible to explain or clear up latent ambiguity). In a letter to the Chairman of Noble Roman's, dated June 16, 2003, Pizza Boxes Vice President Rosenberg stated in relevant part:

You stated in your letter "Noble Roman's is not involved in [the process of

4. In late December 2002 and early January 2003, Noble Roman's placed two purchase orders with Pizza Boxes, one for five cases and the other for eight cases of boxes, to be sent to a franchisee in Los Angeles, and Gilbert requested that Rosenberg bill Noble Roman's directly. The undisputed designated evidence shows that the reason for the orders was "[b]ecause the product was not where it needed to be. It was on the opposite coast [from] where [Noble Roman's] franchisee was, and [Noble Roman's] needed to get it in an expedited manner because [Multifoods] doesn't do overnight shipping or UPS shipping. So Rosenberg went over to the manu-

facturer of the boxes and actually pulled the boxes off the line and UPS'd [sic] them to satisfy this customer's need to get them up and running." Appellant's App. at 43.

The undisputed designated evidence shows that those orders were special orders and were an "exception" to the parties' agreement. *Id.* Noble Roman's was to be reimbursed for the cost of the boxes by the franchisee. In light of the clear evidence of the parties' course of performance showing that Multifoods was the purchaser, we conclude that the two orders placed by Noble Roman's were an anomaly.

ordering supplies] other than to write specifications for the products and arrange for their manufacture." This is exactly what was done based on the agreement. *We fully understand that your distributor, [Multifoods] would be responsible for payments of deliveries made against this production order.*

Appellant's App. at 203 (emphasis added). And in his deposition, Rosenberg testified to the same effect:

Q. So, when Multifoods submits a purchase order, what does that mean?

A. That means that they are purchasing a logo'd box with the Noble Roman's logo.

Q. *Therefore, Multifoods is the purchasing entity?*

A. For the product, *yes.*

Q. And for that reason you bill Multifoods?

A. Correct.

Q. So they're the ones—*you bill Multifoods because you understand them to be the ones making the payments?*

A. *Correct.*

Appellant's App. at 153 (emphases added). Under the Uniform Commercial Code, a "purchaser" is defined in relevant part as a person who takes by sale. Ind.Code § 26–1–1–201(32), (33). Because Pizza Boxes sold the boxes to Multifoods and invoiced Multifoods, Multifoods is the purchaser.

In sum, the November letter and the parties' course of performance show the intent of the parties that Multifoods would submit purchase orders against the requirements contract, would be invoiced, and would pay for the boxes supplied by Pizza Boxes. Noble Roman's did not or-

der the boxes in dispute and is entitled to summary judgment on Pizza Boxes' breach of contract claim for the cost of the unused boxes, as a matter of law. However, under the terms of the contract, Noble Roman's is liable to Pizza Boxes for the "portion of the prep charges" still owed for the boxes that were not manufactured. *Id.* at 193. We reverse and remand with instructions to the trial court to determine the amount Noble Roman's owes Pizza Boxes under that provision of the parties' contract.

Reversed and remanded with instructions.

RILEY, J., concurs.

SULLIVAN, J., concurs in part and concurs in result in part with separate opinion.

SULLIVAN, Judge, concurring in part and concurring in result in part.

I readily subscribe to the majority's holding that the confirming letter signed by Mr. Gilbert on behalf of Noble Roman's clearly reflects that Multifoods was contemplated as the purchaser rather than Noble Roman's. Furthermore, other than with possible respect to printing prep charges,[5] Noble Roman's was undertaking no financial obligation with regard to boxes manufactured by Pizza Boxes. In context then, Pizza Boxes could have protected itself by entering into a clear-cut contract with Multifoods rather than enter into a purported contract with Noble Roman's. It did not do so.

However, I diverge from the majority position as to the nature of the arrange-

---

**5.** Noble Roman's concedes that it is liable for up to $4,500 for printing prep charges. It is my view that Pizza Boxes is entitled to collect any portion of prep charges incurred but not paid by Multifoods with respect to boxes actu-ally manufactured by Pizza Boxes without a purchase order from Multifoods or for other boxes not manufactured but for which prep charges were incurred.

ment evidenced by the November 1 letter. It is not a "requirements contract." The November 1 letter states that it "confirm[s] the following order." The order following specifies that the "Quantity: [is for] 2,500,000 [pizza slice boxes]."

The letter does not measure the quantity by the "requirements of the buyer" nor is there a "stated estimate" of the quantity contemplated by the arrangement, as set forth in I.C. § 26–1–2–306. The quantity set forth in the letter confirmed by Mr. Gilbert was unrelated to the actual or anticipated needs of Noble Roman's. For this reason I do not view the November 1 letter to be a requirements contract. *Indiana–American Water Co. v. Town of Seelyville,* 698 N.E.2d 1255 (Ind.Ct.App. 1998); 67 AM.JUR.2d *Sales* § 222 (2003).

Rather, the November 1 confirming letter, if not an actual order for 2,500,000 boxes, is an indefinite quantities agreement. If that agreement did not contain a requirement that Noble Roman's "purchase a guaranteed minimum quantity" from Pizza Boxes it would be illusory and unenforceable. *Indiana–American Water Co.,* 698 N.E.2d at 1260. However, the letter appears to order 2,500,000 boxes which may well be translated into the "minimum" quantity to be manufactured and delivered to Multifoods.

Nevertheless, the dealings of the parties reflect that although the project calling for clamshell boxes for pizza slices to be sold by Noble Roman's franchisees was new, as per Mr. Gilbert the "[e]stimated usage at this stage is from 400,000 to a million units per year to start." Appellant's App. at 184. The discrepancy between the 2,500,000 quantity set forth in the letter itself and the 400,000 to a million units estimated by Mr. Gilbert and communicated to

Mr. Rosenberg as a starting minimum for the first year, at most creates an ambiguitiy as to a guaranteed minimum quantity required by an indefinite quantities contract.

Even if it were to be determined that neither the stated 2,500,000 quantity nor Mr. Gilbert's first year estimate of usage constitutes a guaranteed minimum quantity to be provided by Pizza Boxes, and that therefore the agreement between Pizza Boxes and Noble Roman's was otherwise unenforceable, Noble Roman's is bound by its concession as to liability for the printing prep charges.

Be that as it may, and without reference to whether the letter of November 1, 2002 is a requirements contract or an indefinite quantities contract, the agreement does not obligate Noble Roman's to order or pay for boxes manufactured and delivered by Pizza Boxes to Multifoods. If the letter be construed as an order for 2,500,000 boxes, it was an order placed by Noble Roman's for the benefit of Multifoods and for which Multifoods was financially responsible.[6] Multifoods was not a party to this litigation.

Accordingly, I agree that the summary judgment in favor of Pizza Boxes was erroneous except as to unpaid printing prep charges and that subject to the exception for prep charges, summary judgment was appropriate in favor of Noble Roman's with respect to the agreement represented by the November 2001 letter as confirmed by Mr. Gilbert.

---

**6.** I venture no opinion with respect to whether Noble Roman's had actual or apparent authority to enter into a contract on behalf of

Multifoods nor whether Multifoods might have been liable to Pizza Boxes for the boxes actually manufactured.