## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 13 2015, 10:10 am

*Kevin S. Smith*

**CLERK**

of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANTS

Scott E. Yahne
Yahne Law, P.C.
Munster, Indiana

ATTORNEYS FOR APPELLEES

Larry G. Evans
Richard M. Davis
Sean E. Kenyon
Hoeppner Wagner & Evans LLP
Merrillville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jack Weichman; Medical Management and Data Services, Inc.; and Weichman and Associates, P.C.,

*Appellants-Defendants,*

v.

Domenico Lazzaro, M.D.; Joseph Pabon, M.D.; and Associated Pathologists of Munster, Indiana, P.C.,

*Appellees-Plaintiffs*

April 13, 2015

Court of Appeals Case No. 45A03-1403-PL-81

Appeal from the Lake Superior Court

The Honorable William E. Davis, Special Judge

Case No. 45D05-0710-PL-97

**Bradford, Judge.**

# Case Summary

[1] Appellees-Plaintiffs-Counterclaim Defendants Dr. Domenico Lazzaro, M.D., and Dr. Joseph Pabon, M.D. operated Appellee-Plaintiff-Counterclaim Defendant Associated Pathologists of Munster, Indiana, P.C. ("the Practice"). Dr. Lazzaro became an individual client of Appellant-Defendant Weichman and Associates, P.C. ("Weichman & Associates"), in 1982, which was operated by Appellant-Defendant-Counterclaim Plaintiff Jack Weichman. Dr. Lazzaro and his wife Patricia remained individual clients of Weichman & Associates until 1999, investing in several Weichman-controlled ventures which resulted in losses to the Lazzaros of approximately $800,000.00. The Practice also invested $100,000.00 in a Weichman-controlled venture, which investment was also lost (Weichman-controlled entities collectively known as "Investment Entities").

[2] At some point, Weichman advised the Lazzaro's to open an account with Blunt Ellis Loewi ("Blunt Ellis"). In 1987, Weichman began unauthorized options trading on the account after forging the Lazzaros' signatures on certain documents, trading activity that resulted in losses of approximately $20,000.00 to $22,000.00. Weichman also opened a Blunt Ellis account for the Practice, which was unknown to the Lazzaros. Ultimately, the Practice lost approximately $1,300,000.00 in the Blunt Ellis Account.

[3] Meanwhile, in 1988, the Practice and Appellant-Defendant-Counterclaim Plaintiff Medical Management and Data Services, Inc. ("MMDS"), Inc., also

controlled by Weichman, entered into a billing agreement with the Practice ("the Agreement"). Beginning around 1994, the Practice began experiencing problems related to MMDS's failure to keep accurate records and adequately fulfill reporting requirements. Additionally, as a result of MMDS's use of improper billing codes, the Practice was subjected to Medicare and Medicaid audits, resulting in approximately $41,000.00 in fines, interest, and penalties. In 1999, the Practice terminated the Agreement and switched billing companies. MMDS failed to transfer the Practice's files to the new company in a timely fashion and, in the case of electronically-stored records, never transferred them at all.

[4] In 1999, Drs. Lazzaro and Pabon and the Practice (collectively, "Plaintiffs") sued Weichman, Weichman & Associates, and MMDS (collectively, "Defendants") under various theories, including breach of contract, breach of fiduciary duty, and conversion. MMDS filed a counterclaim of breach of contract, and Weichman counterclaimed for defamation. Trial on the claims finally began in 2009. At trial, Defendants attempted to introduce documents purporting to undermine evidence that Dr. Lazzaro was ignorant regarding the Blunt Ellis accounts, evidence that the trial court did not allow Defendants to introduce on the basis that it had not been timely discovered to Plaintiffs. At the conclusion of trial, the trial court entered judgment in favor of the Practice for $110,000.00 and Dr. Lazzaro for $340,000.00 and denied MMDS's and Weichman's counterclaims.

Defendants argue on appeal that the trial court erred in (I) not dismissing certain of the Plaintiffs' claims for failure to join indispensable parties, (II) rejecting MMDS's breach of contract claim, (III) entering judgment in favor of Dr. Lazzaro and the Practice on claims regarding the Blunt Ellis accounts, (IV) concluding that the Plaintiffs' claims regarding the Blunt Ellis accounts were not time-barred, (V) awarding treble damages based on MMDS's negligent handling of the Practice's billing, and (VI) excluding the evidence of Blunt Ellis accounts proffered at trial. Because we conclude that the trial court erred in denying MMDS's breach of contract claim against the Practice, we affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

Dr. Lazzaro and Patricia became clients of Weichman & Associates in 1982. The Lazzaros remained individual clients of Weichman & Associates until 1999, and while they were clients, Weichman & Associates prepared individual tax returns and personal financial statements for them. Weichman & Associates also did the Practice's accounting from approximately 1987 until 1999. Weichman acted as business/management advisor to the Practice, essentially running it. From 1988 until 1999 neither Dr. Lazzaro nor Dr. Pabon ever received bank statements or general ledgers for the Practice. On May 1, 1988, MMDS entered into the Agreement for billing services with the Practice, which was owned by Drs. Lazzaro and Pabon. MMDS provided billing services for the Practice into 1999.

# I. Investments Controlled by Weichman

As early as 1984, Weichman began advising the Lazzaros on personal financial matters and encouraged several investments, including Broadmoor; U.S. 30 Building Partnership ("U.S. 30 Building"); U.S. 30 Restaurant, Inc. ("U.S. 30 Restaurant"); Landings, Inc. ("Landings"); and Dunes Hotel Partnership ("Dunes Hotel"). Moreover, the Practice invested pension and retirement account funds totaling $100,000.00 in Broad Ridge Plaza Associates, Ltd. ("Broad Ridge"), another Weichman-controlled entity.

By 1989, the Lazzaros had been investing with Weichman for approximately five years but had yet to receive any sort of reports on their investments. In November of 1989, Weichman, upon request, produced a handwritten summary of the Investment Entities. Weichman's summary listed the values of the investments as follows:

| Investment | Fair Market Value of the Investment |
|---|---|
| Broadmoor | $2,500,000-3,000,000 |
| Dunes Motel | $1,500,000 |
| Broad Ridge | $1,200,000 |
| Gathering Building | $225,000 |

| U.S. 30 Restaurant[1] | $500,000 |
|---|---|
| | |

Ex. 4.  The 1989 report was the only one received by the Lazzaros.

[9]     From 1986 to 1993, The Lazzaros invested in Broadmoor, which operated a golf course.  Weichman provided information on Broadmoor to the Lazzaros on a "sporadic" basis and "was evasive most times [they] were trying to get information."  Tr. p. 106.  In 1989, the Lazzaros invested in U.S. 30 Building, which was an investment in "land or buildings[,]"; U.S. 30 Restaurant, which involved the purchase of a restaurant named Phillipe's, later renamed the Gathering; and Dunes Hotel, which invested in "The Spa in Chesterton," which apparently involved a restaurant and hotel.  Tr. p. 112.  At around the same time, the Lazzaros invested in Landings, which operated a bar in Merrillville, Indiana.  The Lazzaros invested a total of $505,000.00 in Broadmoor, $97,000.00 in U.S. 30 Building, $57,000.00 in U.S. 30 Restaurant, $98,500.00 in Dunes Hotel, and $35,000.00 in Landings.  Ultimately, all of the money the Lazzaros invested in the Investment Entities, a total of approximately $793,000.00, was lost.  Additionally, when Broad Ridge was finally sold in 2003, the Practice received no proceeds from the sale.

---

[1]  It is unclear why the Gathering and U.S. Restaurant are listed separately on the investment summary, as U.S. Restaurant apparently owned the Gathering.  As Patricia testified, "I'm not sure what the difference is there."  Tr. p. 139.

## II. The Blunt Ellis Accounts

[10] At some point, Weichman advised the Lazzaros to open an investment account with Blunt Ellis, in which the Lazzaros initially invested $40,000.00. On or about February 20, 1987, without the Lazzaros' knowledge, Weichman forged their names to an application to allow options trading on the Blunt Ellis account. By the time the Lazzaros' Blunt Ellis account was closed in 1989, the account had lost $20,000.00 to $22,000.00 dollars from options trading.

[11] Also, Weichman unilaterally opened a Blunt Ellis account for the Practice, which the Lazzaros only discovered in 1999. Between January of 1987 and July of 1992, $1,437,000.00 was deposited in the Practice's Blunt Ellis account while $1,387,000.00 was withdrawn, resulting in losses of approximately $1,300,000.00. The vast majority of the money withdrawn from the Practice's Blunt Ellis account was taken out the day it was deposited or the day after. Among the transactions was a 1990 check from the Practice's Blunt Ellis account to Broadmoor for $70,000.00. The payment was authorized by neither Dr. Lazzaro nor Dr. Pabon, and there does not seem to have been a legitimate business reason for the transfer, as the Practice never invested in Broadmoor.

## III. MMDS

[12] As previously mentioned, the Practice entered into the Agreement with MMDS, an entity controlled by Weichman, in 1988. The Agreement provided, in part, as follows:

THIS AGREEMENT FOR BILLING SERVICES ("the Agreement") is entered into as this 1st day of May, 1988, between [MMDS] and [the Practice] ("Client").

….

Section 2.   Services to be Provided by MMDS.

(a)  Billing Services.  MMDS shall provide those billing services to Client as are provided for on the attached Schedule A, which is expressly made a part of this agreement.

(b)  Collection Services.  MMDS will provide collection services for accounts unpaid up to 120 days following the billing date by sending one or more appropriate collection letters or follow-up statements with the content and scheduling of letters to be agreed upon by MMDS and Client.  At the end of each month, MMDS shall furnish Client with a report showing all accounts on the books which have been unpaid for 120 or more days.  Within fourteen (14) business days of the receipt of such report, Client will instruct MMDS with respect to each account, either:

(i)  To write off such account; or

(ii)  To commence such further collection efforts as shall be agreed upon by MMDS and Client; or

(iii)  To refer the unpaid account to a collection agency designated by the Client.

….

Section 4.   Fees for Services.

….

(c)  Books and Records.  MMDS represents and warrants that it will maintain accurate books and records of its performance and the results of its billing and collection services on Client's behalf.

….

Section 6.   Preservation of Property and Confidentiality.

(a)  Undertakings by MMDS.  MMDS acknowledges and agrees that all data of Client delivered to and developed by MMDS is

and shall remain the sole and exclusive property of Client, subject to the restrictions of this Agreement and for the term of the Agreement. MMDS agrees that it will not take or permit any of its officers, directors, employees and agents to take any action that would have the effect of making an unauthorized disclosure to an person or entity, in whole or in part, of any proprietary or confidential information of Client, including without limitation, information relating to patients or to the business or professional practices of Client, which is in the possession of or made available to MMDS at any time after the date of execution of this Agreement. MMDS represents and warrants that, as a condition of employment or retention of MMDS, each of its employees and agents would be required to acknowledge the obligations contained in this Section 6(a).

….

Section 8. <u>Term of this Agreement</u>. This Agreement shall be for a term of five (5) years, commencing May 1, 1988, and ending April 30, 1993, unless sooner terminated as provided for herein. At the end of the term of this Agreement, it shall be automatically renewed from year to year thereafter unless either party serves notice on the other party of its intent to terminate this Agreement not less than sixty (60) days prior to the last date of the original term or renewal term of this Agreement, as the case may be.

Section 10. <u>Termination</u>.

(a) <u>Cause</u>. This Agreement may be terminated as follows:

([i]) At the end of the initial term or of any renewal term of this Agreement, upon delivery of written notice by either party not less than sixty (60) days prior to the expiration date of any such initial renewal term; or

(ii) As of the effective date, confirmed in writing by notice from Client to MMDS, of the termination, by non-extension or otherwise, of Client's contract for the provision of professional services to The Community Hospital, Munster, Indiana (the

"Hospital"), for which services MMDS has been retained for provide billing services under this Agreement; or

(iii) At any time upon the occurrence of an Event of Default, if the defaulting party is given both written notice of such default and period of not less than fifteen (15) days to cure or commence to cure such default, when appropriate. In the event of a violation by either party of the provisions of Section 6 of this Agreement, such event or Default shall be grounds for immediate termination by the other party upon delivery of written notice without any requirement of an opportunity to cure.

(b) Effect.… In the event that this Agreement is terminated by either party pursuant to Paragraph (a)(i) or Paragraph (a)(ii) of this Section 10, MMDS shall continue for not less than 120 days to perform and to be compensated for the performance of services in accordance with this Agreement with regard to any accounts receivable outstanding as of the effective date of such termination.

Appellant's App. pp. 49, 50, 53, 54, 55-56, 57, 58-59 (handwritten initials omitted).

[13] MMDS failed to maintain accurate records or adequately report about collection efforts. MMDS also failed to notify the Practice about unpaid accounts that were over 120 days old. MMDS failed to provide reports regarding overdue accounts and also failed to maintain and provide master files, patient demographics, and accounts receivable journals to the Practice.

[14] In approximately 1994, billing issues arose involving the improper use of billing codes required by insurers. The Practice experienced communication difficulties with MMDS and began receiving patient complaints, which had not occurred before. In 1998, improper use of a billing code by MMDS led to a

Medicare audit of the Practice. In 1999, the Practice was subject to a Medicaid audit resulting from MMDS's misuse of the same billing code. The Medicare audit resulted in a fine of over $33,000.00 plus interest and penalties, and the Medicaid audit resulted in a $7000.00 fine.

[15] On July 1, 1999, the Practice sent a termination notice to MMDS, which reads as follows:

> Dear Mr. Weichman:
>
> I am writing on behalf of [the Practice] to give sixty days notice of [the Practice's] termination of the [Agreement] dated May 1, 1988 between [the Practice] and [MMDS], to be effective September 1, 1999. In order to facilitate a smooth transition of [the Practice's] billing to a new billing agent, we expect that MMDS will fulfill its obligations under Section 10(b) of the Agreement with respect to the transition.

Appellant's App. p. 63.

[16] Section 10(b) of the Agreement required MMDS in the event of termination to "employ its best efforts to assist [the Practice] in converting to another billing service … and, in connection with such conversion, will make available to such other billing service all date in [the Practice's] data files currently in possession of MMDS[.]" Appellant's App. p. 59. APS Medical Services ("APS") began billing for the Practice on September 1, 1999. MMDS did not transfer any of the Practice's billing records to APS until January of 2000, and no effort seems to have been made to transfer any electronically-stored data. By March of 2000, MMDS had deleted the Practice's data from its computer and was never transferred to the Practice or APS. The Agreement provided that all data

"delivered to and developed by MMDS [was to] remain the sole exclusive property" of the Practice. Appellant's App. p. 55.

## IV. Procedural History

On November 8, 1999, the Plaintiffs filed a complaint against the Defendants. The complaint alleged that Weichman and Weichman & Associates "mismanaged these investments either negligently, recklessly or intentionally" and sought an accounting of Defendants' handling of all of Plaintiffs' various investments with them. Appellant's App. p. 43. The Practice also claimed that MMDS had breached the terms the Agreement. On January 5, 2000, MMDS filed a counterclaim that the Practice breached the Agreement by failing to pay for services rendered, and the Defendants filed a defamation counterclaim against Dr. Lazzaro.

Over the course of eighteen days between November 16, 2009, and May 11, 2010, the cause was tried to the bench. During trial, Defendants moved for judgment on the evidence for claims relating to the Investment Entities on the basis that the entities themselves had not been made parties. On December 1, 2009, the trial court granted the motion in part, dismissing the Plaintiffs' claim for an accounting from the Investment Entities. The trial court allowed claims of breach of fiduciary duty against Weichman and Weichman & Associates to proceed, however, noting that

> Weichman was the Plaintiffs' personal accountant. He was their business management supervisor, servant, slash, employee. He was a co-investor, partner, i.e., shareholder with them in

investments. And he was the general partner in the partnerships and a managing director in the corporations.

By allowing these different positions, assuming, by allowing himself to assume each of these different positions at the same time, there comes the question in these investment entities as to whether or not be breached his duty to the Plaintiffs as their accountant, regardless of whether he breached his duty to the other shareholders, partners, whether he breached his fiduciary duty to the corporation of the partnership as a whole by being a poor manager, there's still a question, because while he was managing these partnerships and corporations he was also the Plaintiffs' individual accountant and he was their individual management employee of their corporation.

Tr. pp. 1546-47. Following the trial court's partial denial of their motion for judgment on the evidence, the Defendants presented evidence in their defense. Defendants did not renew their motion for judgment on the evidence at the conclusion of their case.

[19] On May 3, 2010, the trial court granted a motion for sanctions that had been filed by Plaintiffs and prohibited the introduction of certain documents by Defendants. Plaintiffs' proffer indicated that the documents in question contained evidence of transactions involving a previous Blunt Ellis account held by the Practice some twenty-four years before. The trial court ruled on the Plaintiff's motion as follows:

Plaintiff files a Motion for Sanctions for Defendant's alleged violation of prior Discovery Orders of this Court. Argument is heard. The Court upon review of Trial Rule 34(B) and 37(B)(2), and the record herein, now Rules as follows:

The Court now finds that the Defendant has violated the Court's Discovery Orders of December 12, 2006, and June 5, 2007. As a

sanction, the Court now enters an Order declaring the discovery documents delivered to Plaintiff on April 28, 29, and 30, 2010, inadmissible and they are not to be referred to at Trial by any witness testimony, per Trial Rule 37(B)(2)(b). Neither the documents nor testimony concerning them will be admitted to oppose Plaintiff's claims nor support Defendant's defenses. Also Plaintiffs are entitled to costs and fees for prosecuting the Motion.

This discovery was not delivered to Plaintiff before the discovery deadline entered by the Court and is not included in the Pre-Trial Order, nor can Defendant show that it was previously delivered to the Plaintiffs or their prior Attorneys. Protective Order of the above sanctions is entered.

Appellant's App. p. 43.

[20] On February 11, 2014, the trial court entered judgment, which contained the following findings and conclusions:

I. This matter came on for a Bench Trial of 18 days duration spread over a period of 7 months. Jurisdiction and venue being agreed upon by the Parties. The action was based upon Plaintiff's complaint and Defendant's answer and counterclaim. The Court now enters the following findings of fact:

….

10. By the mid 90's MMDS was controlling the [Practice's] Profit Sharing Plan and the [Practice's] Pension Plan and taking money from [Practice's] profits to fund the Profit Sharing Plan and made regular deposits into the Pension Plan. Weichman invested [the Practice's] money in [Broad Ridge,] a real estate entity that he, (Weichman) managed.

….

12. Weichman opened investment accounts with [Blunt Ellis] (in investment Company). Money would be deposited into these accounts and then withdrawn with no rational explanation and

the records of these accounts were not kept by any of the Defendants in a regular fashion.

13. As for these investment accounts the lack of records makes it impossible to say how many there were, but they were not opened by [the Practice] or the Plaintiffs. In fact their testimony was that they knew nothing about them and did not authorize and Defendant to open or transfer [Practice] money into them.

….

18. Lazzaro never gave Weichman the authority to take money from [the Practice] and use it in [Lazzaro's personal investments] but a $70,000.00 check was written on [the Practice's Blunt Ellis] account and deposited into one of the partnership accounts (Broadmoor Country Club account with Gainer Bank). The Partnership entity failed and all money invested therein was lost.

19. The Broadmoor Country Club was an entity that Weichman was performing management functions for at this time.

…

39. Weichman advised Lazzaro to open a personal investment account with [Blunt Ellis] for the purpose of investing in Blue Chip Stocks.

40. Sometime later (on/or about February 20, 1987) without Lazzaros' knowledge or consent[,] Weichman forged Lazzaros' name to an application that allowed for options trading from the account.

41. Lazzaro originally deposited $40,000.00 into this account.

42. Weichman authorized all trading on the Lazzaro account.

43. Lazzaro's wife discovered that the account had been altered and that margin trading on options was causing interest on the margins to be deducted from the account.

44. Lazzaro lost $20,000.00 due to unauthorized option trading losses and expenses on the account.

….

## A. As to Plaintiff's Complaint

1. Defendants' losing, disposing of, and deletion of, most of Plaintiff's records, journals, cancelled checks, and reports amounts to spoliation of evidence. Defendant's summaries are self serving[,] inaccurate, and lack credibility.

2. Due to this spoliation of evidence the Plaintiffs are entitled to the presumption that the missing evidence could have been detrimental to the Defendants'. See Cahoon Vs. Cummings 734NE2d535, at 545, (Ind. 2000).

3. The substantial lack of informational facts due to spoliation makes it impossible to determine many areas of Plaintiffs damages, and any entry of damages in these areas would be based on speculation. This is also true of ordering Defendants to prepare an accounting.

4. The Court will award a remedy without resorting to speculation as to areas of damages as possible, but for the above reasons cannot order an accounting.

5. The Defendants … breached their fiduciary duties as accountants, shareholders, partners, general partners, managers, and caused damages to be suffered by all the Plaintiffs.

6. MMDS breached [the Agreement] and therefore authorized [the Practice] to terminate it.

7. MMDS['s] breach resulted in damages to [the Practice].

8. Weichman converted some of the money in [the Practice's] Profit Sharing and Pension Fund by opening at least one [Blunt Ellis] account without the knowledge of [the Practice] and by dealing with the money therein as if it were his own he caused damages to [the Practice].

9. Weichman breached his duty as a Partner or General Partner in the investment entities, which caused damages to Lazzaro and Pabon.

10. Weichman breached his duty as a Director or Share Holder in investment corporations, and caused damages to Lazzaro and Pabon.

11. Weichman, and [Weichman & Associates] breached their duties as an Agent of [the Practice] in regard to its Pension and Profit Sharing Funds.

12. Weichman, and [Weichman & Associates] breached their duties as Accountants by failing to keep their clients, [the Practice], Lazzaro, and Pabon informed of what was being done and not done, dealing with their money without their authorization and taking advantage of their superior knowledge and influence over Plaintiffs' experience in management and tax preparation and other accounting functions. Further by treating Plaintiffs' money as if it belonged to Defendants and converting Plaintiffs' money in some cases. Which caused damage to Plaintiffs.

### B. As to Defendant's Counterclaim

1. The law with [the Practice] and against the Counter-claimant MMDS on MMDS' claim for breach of contract.

2. MMDS breached the contract by its failure to prepare, maintain, and provide reports, records, ledger journals to [the Practice].

3. The law is with Lazzaro and against Weichman on his defamation and libel claims.

IV. The Court now enters the following judgments in favor of Lazzaro, and [the Practice] and against [the Defendants].

A. [The Practice] has a judgment for breach of contract, conversion, and breach of fiduciary duties against MMDS and Weichman in the amount of $110,000.00 plus prejudgment interest from November 8, 1999 at 8% per year and judgment interest from the date of this Order at 8% per year. (The $110,000.00 encompasses treble damages for the act of conversion found by the Court).

B. Lazzaro has a judgment against Weichman, [Weichman & Associates], and [MMDS] for breach of fiduciary duties and conversion for $340,000.00 plus prejudgment interest from November 8, 1999 at 8% per year and judgment interest from the date of this Order at 8% per year. (The $340,000.00 encompasses treble damages for the acts of conversion found by the Court).

C. Plaintiff's claim for an accounting from [Weichman & Associates] and MMDS fails due to lack of documentation, records and reports what when or if they existed were in the exclusive control of Defendants. Thus the Court's conclusion that there does not now exist enough facts and records for Defendants' to realistically prepare a complete accounting for the individual and/or collective Plaintiffs.

D. Plaintiff, Pabon did not prove his individual case by the greater weight of the evidence.

E. Counter-Defendants; Lazzaro, Pabon, and [the Practice] receive judgment against Counter-claimants, Defendants, since Weichman, and MMDS failed to prove their Counterclaims by the greater weight of the evidence.

Appellant's App. pp. 28, 29-30, 32-33, 39-41 (record citations omitted).

[21] Defendants argue on appeal that the trial court erred in (I) not dismissing certain of the Plaintiffs' claims for failure to join indispensable parties, (II) concluding that MMDS breached the Agreement despite the Practice's failure to comply with the conditions precedent of sending a notice of default and allowing an opportunity to cure, (III) entering judgment in favor of Dr. Lazzaro and the Practice on claims regarding the Blunt Ellis accounts, (IV) concluding that the Plaintiffs' claims regarding the Blunt Ellis accounts were not time-barred, (V) awarding treble damages based on MMDS's negligent handling of the Practice's billing, and (VI) excluding certain evidence.

# Discussion and Decision

## Overall Standard of Review

[22] The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52.

> When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. "First, it must determine whether the evidence supports the trial court's findings of fact; second, it must determine whether those findings of fact support the trial court's conclusions of law." *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 158 (Ind. 1994) (citation omitted). Findings will only be set aside if they are clearly erroneous. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id*. (citation omitted). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *State v. Van Cleave*, 674 N.E.2d 1293, 1296 (Ind. 1996), *reh'g granted in part*, 681 N.E.2d 181 (Ind. 1997). In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id*. at 1295.

*Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). It is well-settled, however, that "on appellate review the trial court's judgment will be affirmed if sustainable on any theory or basis found in the record." *Havert v. Caldwell*, 452 N.E.2d 154, 157 (Ind. 1983). We review each of the Appellants' claims with this proposition in mind.

[23] As an initial matter, it is not entirely clear from the trial court's order of judgment precisely how the trial court allocated damages between the various

defendants—Weichman, Weichman & Associates, and MMDS—or on what precise claims the damages were awarded:

> A. [The Practice] has a judgment for breach of contract, conversion, and breach of fiduciary duties against MMDS and Weichman in the amount of $110,000.00 plus prejudgment interest from November 8, 1999 at 8% per year and judgment interest from the date of this Order at 8% per year. (The $110,000.00 encompasses treble damages for the act of conversion found by the Court).
>
> B. Lazzaro has a judgment against Weichman, [Weichman & Associates], and [MMDS] for breach of fiduciary duties and conversion for $340,000.00 plus prejudgment interest from November 8, 1999 at 8% per year and judgment interest from the date of this Order at 8% per year. (The $340,000.00 encompasses treble damages for the acts of conversion found by the Court).

Appellant's App. pp. 40-41.

[24] At least one aspect of the above must be set aside as unsupported by the record. To the extent that the trial court entered judgment against MMDS in favor of Dr. Lazzaro, that entry cannot be affirmed, as Dr. Lazzaro individually made no claim against MMDS. Evaluation of the trial court's judgment, when considered together with the Plaintiffs' actual claims, leads to the following inferences: (1) the trial court's award of $110,000.00 to the Practice is a combination of damages resulting from MMDS's breaches of the Agreement and/or damages arising from the Blunt Ellis account Weichman opened using Practice money, and (2) the trial court's award of $340,000.00 to Dr. Lazzaro is a combination of damages resulting from Weichman's unauthorized trading on the Blunt Ellis account and/or damages resulting from Weichman's improper

or negligent handling of Investment Entity funds. It is also not possible to determine which portion of each award represents treble damages due to conversion, as both awards rest on multiple bases.

# I. Whether Dr. Lazzaro and the Practice Were Required to Name Additional Parties to Pursue Claims for Breach of Fiduciary Duties

[25] Weichman and Weichman & Associates contend that Dr. Lazzaro and the Practice failed to bring in all of the necessary parties in their claim for breach of fiduciary duties with respect to the Investment Entities, namely, the Investment Entities themselves. Dr. Lazzaro and the Practice first argue that Weichman and Weichman & Associates did not renew their motion for judgment on the evidence at the conclusion of their case and have therefore waived this argument for appellate review. We agree. "We have held that when a defendant moves for a judgment on the evidence and then introduces evidence on his own behalf after the motion is denied, the defendant has waived any alleged error regarding the denial of the motion." *Hartford Steam Boiler Inspection & Ins. Co. v. White*, 775 N.E.2d 1128, 1134 (Ind. Ct. App. 2002), *trans. denied*; *see also* Ind. Trial Rule 50(A)(6) ("A motion for judgment on the evidence made at one stage of the proceedings is not a waiver of the right of the court or of any party to make such motion on the same or different issues or reasons at a later stage as permitted above, except that error of the court in denying the motion shall be deemed corrected by evidence thereafter offered or

admitted."). Weichman and Weichman & Associates have waived this issue for appellate review.

[26] In any event, because the merits of this claim are easily disposed of, we elect to address them. As Weichman and Weichman & Associates point out, the precise question of whether an entity from which an accounting is sought must be a party has not been squarely addressed in Indiana, but relies on the Court of Appeal of Louisiana's holding that "[i]t is our opinion that the orderly liquidation and settlement of a partnership requires that the partnership itself, in addition to the members thereof be made a party to the proceedings." *Quarles v. Albritton*, 116 So. 2d 175, 178 (La. Ct. App. 1959). While this seems a sensible enough rule, the facts of this case do not require us to adopt or reject it. While the Plaintiffs did, indeed, seek an accounting from the various Investment Entities, such an accounting was not done. As previously mentioned, the trial court concluded that the state of available records made an accounting by any of the Investment Entities impossible. Because no accountings were actually done, any error in not requiring the Investment Entities to be joined as parties can only be considered harmless. "An error is harmless if it does not affect the substantial rights of the parties." *Bonnes v. Feldner*, 642 N.E.2d 217, 219 (Ind. 1994) (citing Ind. Trial Rule 61).

## II. Whether Plaintiffs' Alleged Failure to Send a Notice of Default or Extend an Opportunity to Cure to MMDS Necessitates Dismissal of their Breach of Contract Claim

[27] "The first rule in the interpretation of contracts is to give meaning and effect to the intention of the parties as expressed in the language of the contract." *Stech v. Panel Mart, Inc.*, 434 N.E.2d 97, 100 (Ind. Ct. App. 1982). "In ascertaining the intention of the parties, a court must construe the instrument as a whole, giving effect to every portion, if possible." *Id.* "In interpreting an unambiguous contract, a court gives effect to the parties' intentions as expressed in the four corners of the instrument, and clear, plain, and unambiguous terms are conclusive of that intent." *Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1142 (citing *Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Ctr. of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind. Ct. App. 1997)). "Courts may not construe clear and unambiguous provisions, nor may it add provisions not agreed upon by the parties." *Id.* (Ind. Ct. App. 2003) (citing *Hyperbaric Oxygen Therapy Sys.*, 683 N.E.2d at 247-48). However, it is well-settled that "[i]f the terms of a written contract are ambiguous, it is the responsibility of the trier-of-fact to ascertain the facts necessary to construe the contract." *Newnam Mfg., Inc. v. Transcon. Ins. Co.*, 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). "A contract is ambiguous only if reasonable persons would differ as to the meaning of its terms." *Oxford Fin. Group*, 795 N.E.2d at 1142 (citing *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002)).

# A. Breach

MMDS argues that the Practice's failure to send it a notice of default or give it an opportunity to cure any default rendered the Practice's September 1, 1999, termination of the Agreement ineffective. The Practice counters that MMDS violated Section 6 of the Agreement, thereby entitling the Practice to terminate the Agreement without providing MMDS with notice of default or affording it an opportunity to cure. MMDS responds to the Practice's contention by arguing that there is no trial court finding that the Practice violated Section 6 of the Agreement and, in any event, nothing in the record that would support such a finding. We conclude that MMDS is correct on this point.

As previously mentioned, only a violation of Section 6 of the Agreement by either party allows the other party the right of immediate termination without opportunity to cure. The Practice points to evidence that MMDS's improper coding resulted in delays in payment and nonpayment to the Practice and contends that those violations of the Agreement constituted unauthorized disclosures of the Practice's proprietary or confidential information. Consequently, the Practice argues, MMDS violated Section 6, which allowed the Practice to terminate the Agreement immediately without affording an opportunity to cure. We do not see, and the Practice does not explain, how improper billing constitutes an unauthorized disclosure of confidential information.

The Practice also argues that MMDS's failure to maintain and provide to the Practice master files and accounts-receivable journals violated Section 6's

requirement that "all data of Client delivered to and developed by MMDS is and shall remain the sole and exclusive property of the Client[.]" Appellant's App. p. 55. As with its previous Section 6 argument, the Practice fails to explain, and we do not see, how a failure to turn over and provide proper record following the Practice's termination of the Agreement, without more, constituted a violation of Section 6. Consequently, without a Section 6 violation, the Practice could not avail itself of the Agreement's language allowing termination based on an alleged default without opportunity to cure.

In any event, the Practice did not allege a default in its notice of termination; it seems apparent that the Practice was attempting, at least, to terminate pursuant to Section 10(a)(i), which provided for termination "[a]t the end of the initial term or of any renewal term of this Agreement, upon delivery of written notice by either party not less than sixty (60) days prior to the expiration date of any such initial renewal term[.]" Appellant's App. p. 58. This provision does not, however, allow for termination sixty days from the *notice* but only at the end of the next renewal term. Therefore, the Practice's July 1, 1999, notice was sufficient to establish a termination date of April 30, 2000, not September 1, 1999. The trial court's conclusion that MMDS failed to establish a breach by the Practice is clearly erroneous.

## B. Effect of the Practice's Breach of the Agreement

Having concluded that MMDS established a breach of the Agreement by the Practice, we must now determine the relief. MMDS contends that the Practice's breach of contract claim must be dismissed entirely because of its

improper termination of the Agreement. The Practice does not respond to this argument, resting on its argument that its termination of the Agreement was proper. Despite the Practice's failure to specifically respond to MMDS's argument, we cannot accept that the proper remedy is dismissal of the Practice's claim against MMDS.

[33] Although the issue does not appear to have been squarely addressed in Indiana for quite some time, it seems clear that when one party sues for breach of contract and the other countersues for breach of the same contact, the proper remedy when both parties are found to have breached is a set-off of the parties' respective damages. In *Houston v. Young*, 7 Ind. 200 (1855), Houston leased a farm to Young with the stipulation "that Young should put the farming land, estimated to contain one hundred and thirty acres, in corn." *Id*. at 200.

> The ground was to be properly prepared and in good season; the fallen timber cleared off; the fences righted up; and every thing done in a farmer-like manner. The corn was to be plowed at least three times, and the house, barn and orchards properly cared for.
>
> Houston and others, on their part, were to maintain the plaintiffs in the possession of the premises, so long as they continued to fulfill the contract; grant them certain privileges necessary to its proper enjoyment; and at the close of the period of tending the crop, release them from any further care thereof; and pay them 3 dollars per acre for the cultivation of the corn. The rails for repairs were also to be hauled by Houston and others, the defendants below.

*Id*.

[34]    Young eventually brought suit, alleging that Houston and others failed to pay the agreed-upon three dollars per acre and requested $420.00 in damages. *Id.* The defendants answered, alleging

> 1. That the plaintiffs had failed to cultivate, &c., in good season, in a proper manner, &c., laying their damages, by reason of such negligence, at 400 dollars.
>
> 2. The second paragraph alleges a failure to perform in relation to clearing off the timber and repairing the fences, &c., laying their damages in this regard at 200 dollars.
>
> 3. The third paragraph alleges a payment of 246 dollars and 81 cents on the contract.

*Id.*

[35]    Following entry of judgment in favor of Young for $70.00, Houston appealed, essentially arguing that the trial court "did not allow the defendants a sufficient amount in damages by way of recoupment." *Id.* at 201. The Indiana Supreme Court reversed, holding as follows:

> That the defendants were entitled to recoupment, can not be doubted. Recoupment will be allowed whenever an action for damages can be sustained and thus circuity of action avoided. *Clark v. Wildridge*, 5 Ind. 176. For the careless and unfarmerlike manner of cultivation disclosed in the evidence, Houston and others could have maintained an action for damages. They were, therefore, entitled to recoup. And Courts will favor recoupment rather than to drive the party to a separate action.

*Id.* at 202.

[36]    The principle enunciated in *Houston*—that claims by both parties alleging breach of the same agreement can be disposed of in the same suit—remains

good law. Consequently, we remand with instructions for trial on the question of MMDS's damages resulting from the Practice's improper termination of the Agreement, any amount found to be set off against the Practice's damages resulting from MMDS's breaches.

## III. Whether Judgment in the Plaintiffs' Favor for Claims Regarding the Blunt Ellis Accounts Is Supported by Sufficient Evidence

[37] Weichman and Weichman & Associates contend that insufficient evidence supports the trial court's judgment to the extent that it concluded that Weichman and Weichman & Associates converted money that was deposited in the Blunt Ellis accounts. As previously mentioned, we will not set aside the judgment of the trial court unless it is clearly erroneous. "We will not reweigh the evidence nor reassess the credibility of the witnesses before the court." *Speed v. Old Fort Supply Co.*, 737 N.E.2d 1217, 1219 (Ind. Ct. App. 2000). "Rather, we will affirm if there is sufficient evidence of probative value to support the decision, viewing the evidence most favorable to the judgment and the reasonable inferences drawn therefrom." *Id*.

[38] Although both Dr. Lazzaro personally and the Practice had claims against Weichman regarding Blunt Ellis accounts, the Defendants' argument is limited to whether sufficient evidence was presented to support a finding that Weichman converted Practice funds that were deposited in its Blunt Ellis account. We conclude that the Practice presented sufficient evidence to support such a conclusion.

[39] Patricia testified that the Practice's Blunt Ellis account was discovered in 1999, records dating back to 1987 were eventually discovered, and that nobody associated with the Practice authorized the account. The Practice also presented evidence that between January of 1987 and July of 1992, $1,437,000.00 was deposited in the Practice's Blunt Ellis account while $1,387,000.00 was withdrawn, resulting in losses of approximately $1,300,000.00. The vast majority of the money withdrawn from the Practice's Blunt Ellis account was taken out the day it was deposited or the day after. Among the transactions was a 1990 check written by Weichman from the Practice's Blunt Ellis account to Broadmoor for $70,000.00. The payment was authorized by neither Dr. Lazzaro nor Dr. Pabon, and there does not seem to have been a legitimate business reason for the transfer, as the Practice never invested in Broadmoor.

[40] At the very least, the $70,000.00 transfer from the Practice's Blunt Ellis account to Broadmoor, an Investment Entity controlled by Weichman, raises a reasonable inference of conversion. "Conversion, as a tort, consists either in the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's." *Computers Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995) (citing *Shank Fireproof Warehouse Co. v. Harlan*, 108 Ind. App. 592, 29 N.E.2d 1003 (1940)). We conclude that a reasonable fact-finder could find

that the unauthorized transfer of the Practice's funds from an unauthorized account to an Investment Entity controlled by Weichman amounts to the appropriation of the Practice's property for personal use. This conversion by itself, when trebled, is more than sufficient to account for the $110,000.00 judgment entered in favor of the Practice. Weichman and Weichman & Associates have failed to establish that the trial court's judgment, to the extent that it involves the Blunt Ellis account, is unsupported by sufficient evidence.

## IV. Whether the Plaintiffs' Claims Regarding the Blunt Ellis Accounts Are Barred by the Statute of Limitations

[41] The Defendants contend that all claims based on Blunt Ellis accounts are barred by the statute of limitations, which provides as follows:

> The following actions must be commenced within six (6) years after the cause of action accrues:
>
> (1) Actions on accounts and contracts not in writing.
>
> (2) Actions for use, rents, and profits of real property.
>
> (3) Actions for injuries to property other than personal property, damages for detention of personal property and for recovering possession of personal property.
>
> (4) Actions for relief against frauds.

Ind. Code § 34-11-2-7.

[42] The Plaintiffs, *inter alia*, note that the Defendants failed to assert a statute of limitations defense in their responsive pleading and argue that they have therefore waived it. It is well-settled that "Indiana Trial Rule 8(C) requires parties to plead some affirmative defenses … or forfeit them." *Bunch v. State*,

778 N.E.2d 1285, 1287 (Ind. 2002). A statute of limitations defense is one of the affirmative defenses mentioned in Trial Rule 8(C): "A responsive pleading shall set forth affirmatively and carry the burden of proving: … statute of limitations[.]" Because Defendants failed to assert a statute of limitations defense in their responsive pleadings, they may not now raise it on appeal. *See Sloan v. Town Council of Town of Patoka*, 932 N.E.2d 1259, 1260 (Ind. Ct. App. 2010) ("At no time did the Town of Patoka raise the affirmative defense in Sloan's inverse condemnation cause. Therefore, we find that the Town waived its Statute of Limitations claim.").

## V. Whether the Trial Court Properly Awarded Treble Damages to Plaintiffs for MMDS's Negligent Handling of the Practice's Billing

[43] MMDS contends that the trial court erred in awarding treble damages based on MMDS's negligent handling of the Practice's billing. Indiana Code section 34-24-3-1 provides as follows:

> If a person has an unpaid claim on a liability that is covered by IC 24-4.6-5 or suffers a pecuniary loss as a result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, or IC 35-45-9, the person may bring a civil action against the person who caused the loss for the following:
>
> (1) An amount not to exceed three (3) times:
>
> (A) the actual damages of the person suffering the loss, in the case of a liability that is not covered by IC 24-4.6-5; or
>
> (B) the total pump price of the motor fuel received, in the case of a liability that is covered by IC 24-4.6-5.

(2) The costs of the action.

(3) A reasonable attorney's fee.

As previously mentioned, it is not possible to precisely determine which portion of the trial court's award to the Practice was based on misconduct by Weichman and/or Weichman & Associates and which portion was based on MMDS's breach of the Agreement. However, as we have previously concluded, the Practice presented evidence of a $70,000.00 conversion by Weichman, more than sufficient by itself to support the trial court's $110,000.00 judgment in favor of the Practice. Any possible error the trial court may have made in awarding treble damages based on MMDS's conduct can only be considered harmless. "An error is harmless if it does not affect the substantial rights of the parties." *Bonnes*, 642 N.E.2d 219 (citing Ind. Trial Rule 61).

## VI. Whether the Trial Court Abused its Discretion in Excluding Certain Blunt Ellis Documents

Defendants contend that the trial court abused its discretion in excluding certain documents proffered during trial, documents pertaining to Blunt Ellis accounts which, according to Defendants, contradict Dr. Lazzaro's claims of ignorance about the accounts. Pursuant to Trial Rule 37(B)(2)(b), failure to comply with a discovery order allows the trial court, *inter alia*, to issue "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence[.]"

The grant or denial of motions for discovery, motions for sanctions, and motions for a continuance rests in the sound discretion of the trial court, and will be reversed only for an abuse of that discretion. *Keesling v. Baker & Daniels* (1991), Ind. App., 571 N.E.2d 562, 566, *trans. denied* (discovery); *Nesses v. Specialty Connectors Co., Inc.* (1990), Ind. App., 564 N.E.2d 322, 327 (sanctions); *Danner v. Danner* (1991), Ind. App., 573 N.E.2d 934, 937, *trans. denied* (continuance). An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts of the case. *Terre Haute Regional Hospital, Inc. v. Trueblood* (1991), Ind. App., 579 N.E.2d 1342, 1345, *reh'g denied.*

*Hudgins v. McAtee*, 596 N.E.2d 286, 289 (Ind. Ct. App. 1992).

[46] In light of the circumstances of the attempted introduction of the documents in question and the Defendants' history of discovery abuses in this case, we cannot say that the trial court abused its discretion in this regard. Defendants did not attempt to introduce the Blunt Ellis documents until May 3, 2010, after trial had begun and over ten years after Plaintiffs originally filed suit. As the trial court noted, the failure to discover the material violated discovery orders entered on December 12, 2006, and June 5, 2007. Moreover, the Defendants had demonstrated a history of discovery abuses, some of which had previously resulted in sanctions. Discovery disputes and delays resulted in the imposition of sanctions on Defendants in 2002. Depositions had to be delayed due to the Defendants' lack of document production. The trial court entered sanctions against Defendants again in 2005, and awarded attorney's fees of $14,057.50 to Plaintiffs in 2007. In light of the Defendants' failure to comply with long-standing discovery orders and their history of discovery abuses, we cannot say that the trial court abused its discretion in this regard.

# Conclusion

[47] We conclude that the trial court correctly refused to dismiss Plaintiffs' claims related to the Investment Entities for failure to join indispensable parties, entered judgment in favor of Dr. Lazzaro and the Practice on claims regarding the Blunt Ellis accounts, and excluded the evidence of Blunt Ellis accounts proffered at trial. We further conclude that the Defendants waived any statute of limitations defense they might have had to allegations related to the Blunt Ellis accounts and that any error the trial court might have made imposing treble damages for MMDS's breach of the Agreement is harmless. Finally, we conclude that the trial court erred in dismissing MMDS's breach of contract claim against the Practice and remand for trial on the question of damages only.

[48] The judgment of the trial court is affirmed in part and reversed in part, and we remand with instructions.

Najam, J., and Mathias, J., concur.